ABRAHAM B. JOHNSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. T. WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HENRY WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MRS. HENRY WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. A. WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILSON BROS. & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 8455–8460. Promulgated July 29, 1927.

1. It does not necessarily follow from a mere showing that a corporation purports to be one of the members of a partnership that there was no legal partnership.

2. A restoration to invested capital of assets previously charged to expense can not be made in the absence of satisfactory evidence as to the cost of these assets.

3. A claimed loss on abandonment of depreciable assets denied in the absence of evidence as to the terms of the lease on the premises on which the assets were constructed from which the Board might determine the allowable depreciation prior to abandonment.

4. A refund in 1917 of tentative payments made in 1916 on account of workmen's liability insurance in the State of Washington, *held* to serve as a reduction of operating costs for 1916 and consequently to increase surplus as at January 1, 1917.

5. Rate of 7 per cent used by the Commissioner for the purpose of the excess-profits credit under section 205 (a), Revenue Act of 1917, approved in the absence of a showing that the Commissioner was in error.

6. Interests in a vessel, acquired by gift, are subject to depreciation on the basis of their fair market value at the date of acquisition. Additional depreciation based upon a claimed valuation on such dates denied for lack of satisfactory proof as to value.

7. The fact that a married man, who is a resident of California, owns an interest in a partnership in Washington, a community property State, from which income is derived, does not necessarily prove that the income from the Washington property will be community income when received.

8. Sale found to have taken place in 1917.

*W. W. Spalding, Esq.*, for the petitioners.
*Bryce Toole, Esq.*, for the respondent.

These proceedings, which were consolidated for hearing and decision, involve the following proposed deficiencies: F. A. Wilson, 1918, $2,296.60, and 1919, $724.55; Henry Wilson, 1918, $6,591.52, and 1919, $2,596.80; Mrs. Henry Wilson, 1918, $576.48, and 1919, $386.59; W. T. Wilson, 1918, $2,271.46, and 1919, $692.90; and Abraham B. Johnson, 1918, $909.02, and 1919, $274.14. The petition of Wilson Bros. & Co. involves action by the Commissioner for 1917, wherein an assessment of $37,049.99 was made in 1923 and claim in abatement was filed by the petitioner. The Commissioner notified the petitioner on September 4, 1925, of a proposal to allow the claim to the extent of $1,659.69, on account of which notice this appeal was duly taken. Similarly, an assessment was made against Abraham B. Johnson for 1917 of $1,476.64, on account of which an abatement claim was filed in 1923. The Commissioner notified the petitioner on September 4, 1925, of a proposal to allow the claim to the extent of $434.34, and the petitioner duly appealed from such proposal. In addition to the foregoing, overassessments not arising from the denial of abatement claims were shown for Henry Wilson and Mrs. Henry Wilson for 1917 in the respective amounts of $4,749.81 and $48, but jurisdiction will be taken of these years insofar as may be necessary for a determination of deficiencies for other years.

The evidence submitted consists of depositions taken in San Francisco, Calif.

### FINDINGS OF FACT.

Wilson Bros. & Co. has been operating as a partnership since about 1890 with its office in San Francisco, Calif.

In 1917, this firm was composed of Charles R. Wilson Estate, Inc., A. B. Johnson, and Henry Wilson, and was engaged in the general lumber, manufacturing and shipping business. The lumbering and sawmill operations were carried on in the State of Washington, where the firm owned property consisting of timberlands, farm, and logged-

off lands, wharves, and logging railroads. The firm also operated a lumber business in San Francisco, Calif., which included a retail lumber yard. In addition, the firm owned and operated steamships.

The retail lumber yard was operated on premises leased from the Southern Pacific Co., on which Wilson Bros. & Co. erected, maintained and used in its business the following building and equipment:

1. An office building, containing 1200 square feet of floor space, rebuilt in about the year 1912.

2. Wharf 40 by 100 feet, containing 4,000 square feet, rebuilt in about the year 1912.

3. Foundations for piling lumber consisting of approximately 12,000 lineal feet, owned on March 1, 1913.

4. Plank-gangways consisting of approximately 90,000 square feet, owned on March 1, 1913.

5. Lumber sheds 50 by 100 feet, rebuilt in 1912.

6. Two hundred and six lumber buggies or trucks, owned on March 1, 1913.

The foregoing items did not appear on the books of Wilson Bros. & Co. as assets, since the cost had been charged to expense at the time of acquisition or construction, or charged off prior to the end of the year in which acquired or constructed. The books of account of the firm are incomplete for all years prior to 1917.

The terms of the lease for the premises on which the retail lumber yard was located are not shown, other than that it provided that the tenant had the right to remove the buildings and appurtenances at the expiration of the lease. In October, 1917, Wilson Bros. & Co. gave up the aforementioned lease and abandoned the property located on the premises with the exception of lumber trucks, which were sold for $1,410 and the amount received therefor included in its sales for that year. The cost of removing the buildings and other improvements would have been greater than the value of the salvage which would have been realized therefrom.

During the years prior to January 1, 1917, Wilson Bros. & Co. took depreciation on its assets which it considered sufficient to offset sustained depreciation. The Commissioner, in his determination of the invested capital of Wilson Bros. & Co. for 1917, reduced invested capital as at January 1, 1917, by $34,831.75, on the ground that depreciation taken on the books prior to January 1, 1917, was insufficient to the foregoing extent.

On September 28, 1916, Wilson Bros. & Co. executed the following option to sell the S. S. *Columbia* to the Hammond Lumber Co.:

We hereby confer upon you an option to purchase the American Steamship "COLUMBIA" for the sum of $425,000.00, less 2½% commission. The said vessel is now under time charter to W. R. Grace & Company under charter party in writing dated December 21, 1915, upon which charter she entered February 18, 1916, the term of charter being for a period of about one year, ten per cent more

or less. This option shall exist for the period of thirty days from the date hereof at the end of which period, if you shall not have exercised same it shall terminate without action on our or your part. Upon the exercise by you of this option you shall pay ten per cent of the said purchase price, the balance to be paid upon delivery of the vessel, which shall be either at San Francisco or Puget Sound, at the option of purchasers. Purchasers shall have the privilege either of purchasing and taking delivery of said vessel before the expiration of said charter party, in which event they shall assume the performance of the completion of said charter party and the undersigned shall be entitled to charter hire until complete purchase price is paid and from thence charter shall inure to the benefit of purchasers, or at the option of purchasers delivery of said vessel may be had upon completion of said charter party, in which event operation under the said charter party shall be for the account of the undersigned.

You shall have the privilege of assigning this option, provided in the event you elect to receive delivery of said vessel prior to the expiration of said charter party you remain responsible for the performance of said charter party.

The above vessel is now classed in the American Bureau of Shipping, but in the event purchasers should insist upon highest classification for ocean going vessels in the Bureau Veritas, we will furnish same at our expense—provided that the undersigned will not contribute more than five hundred dollars to the fees for such classification.

On October 20, 1916, the option was exercised by the Hammond Lumber Co. in the manner set out in the following letter:

Referring to option agreement, dated September 28, 1916, between us, we hereby exercise the option therein contained and agree to purchase the American Steamship "COLUMBIA" for the sum of $425,000.00, less 2½%, and in accordance with the terms of said option we hereby tender to you our check in the sum of $42,500.00, constituting 10% of the gross purchase price, the balance of the purchase price, to-wit: the sum of $371,875.00 net, to be payable by us to you upon delivery of said vessel to us and the passing of the customary and sufficient documents of title with warranty as to the whole of said steamer, together with certificate of highest classification for ocean going vessels of Bureau Veritas, we paying the excess fees, if any, over $500.00 which may be incurred for such classification.

In the event of the loss or non-delivery of said steamer, then you shall repay to us the said sum of $42,500.00, said steamer to be solely at your risk, but without liability on your part therefor until said steamer is delivered to us.

We hereby elect to take delivery of said steamer as provided in said option agreement, upon expiration of the charter party referred to therein, allowing you a reasonable time within which to make such repairs as may be necessary, if any, to put said steamer in a sound and seaworthy condition and to effect said Bureau Veritas classification.

Wilson Bros. & Co. approved and accepted the letter of October 20, 1916. The $42,500 referred to was paid as indicated and the remainder when the ship was delivered in 1917. During the period in controversy as to the sale, A. B. Johnson owned 7/100 of the steamer in question and Henry Wilson, 28/100, and Wilson Bros. & Co. were acting as operating agents.

During 1916, Wilson Bros. & Co. paid premiums to the State of Washington on account of workmen's compensation insurance, which the laws of this State require certain employers to carry. At the beginning of 1916, the State fixed an arbitrary rate to be paid for the year and payments were accordingly made by Wilson Bros. & Co. When full information was in the hands of the State, after the close of 1916, it was found that Wilson Bros. & Co. had paid $1,009.23 in excess of the amount which it should have paid for 1916 and this amount was refunded by the State in 1917.

Henry Wilson, one of the petitioners herein, made a gift of certain interests in ships to each of his sons, F. A. Wilson and W. T. Wilson, petitioners in these proceedings, as follows: In 1916, 2/64 interest in the S. S. *Svea;* in March, 1917, 5/100 interest in the S. S. *Idaho;* and in January, 1918, a 5/32 interest in the S. S. *Oregon.* In March 1917, Mrs. Henry Wilson received by gift from her husband, Henry Wilson, a 20/100 interest in the S. S. *Idaho.*

On January 2, 1918, F. A. Wilson and W. T. Wilson, were each given a 5/32 interest in the firm of Wilson Bros. & Co., by their father, Henry Wilson, who was at this time one of the members of the firm. At this time Wilson Bros. & Co. owned timber and timber lands in Lewis and Harbor Counties, Washington. The firm also owned sawmills and equipment at Aberdeen, Wash.

During 1917, 1918, and 1919, Henry Wilson and A. B. Johnson were residents of California, and during these years each was married and living with his wife in California.

### OPINION.

LITTLETON : We will consider first the issues raised directly by the petition of Wilson Bros. & Co., a partnership, as follows:

1. Whether Wilson Bros. & Co. is to be taxed as a partnership in 1917.

2. The failure of the Commissioner to include in invested capital for 1917 certain assets which did not appear on the books of the company.

3. The failure of the Commissioner to allow a loss in 1917 on account of the abandonment of certain assets.

4. The reduction of invested capital in 1917 by what the Commissioner considered inadequate depreciation in prior years.

5. The inclusion as income for 1917, of the sum of $1,009.23, representing a refund to Wilson Bros. & Co. in 1917 of an excessive premium paid by the firm in 1916 on account of workmen's liability insurance for 1916.

6. The use of 7 per cent instead of 9 per cent in computing the deduction allowable under section 205 (a), Revenue Act of 1917.

The first issue has to do with the status of Wilson Bros. & Co. as a taxable entity in 1917. The firm filed a partnership return for 1917 which was not questioned by the Commissioner as representing its true status. In the petition it is alleged that the firm is a partnership which allegation is admitted by the Commissioner. However, on

the basis of evidence presented that the firm during 1917 had a corporation as one of its members, the petitioner contends that there could not have been a partnership for 1917, but only a joint venture, on the ground that a corporation can not be a member of a partnership.

No evidence was introduced as to the charter of the corporation or the State under which it was incorporated. In effect, therefore, what the petitioner asks is that the Board hold that wherever a corporation purports to be a member of a partnership, no partnership in fact or in law exists and, consequently, a deficiency asserted against such an organization as a partnership should be disallowed.

An examination of the authorities shows that while as a general proposition a corporation may not become a member of a partnership, this rule is subject to important exceptions. Cook on Corporations, vol. 3, p. 2667, makes this statement:

A CORPORATION CANNOT BE A PARTNER IN A PARTNERSHIP. This is an old principle of law, but it is subject to exceptions. It is held to be an ultra vires act because the stockholders are entitled to have their directors conduct the business without sharing that power with a partner, but if a corporation may organize for any lawful purpose, its articles of incorporation may authorize it to become a partner.

To a similar effect we find the following rule stated in 14 C. J. 291:

The power of a corporation to enter into a partnership depends upon its charter or organic law, there being nothing inherently illegal in such an act, unless by statute it is provided that every corporation shall manage its own affairs separately and exclusively.

In an opinion of the Circuit Court of Appeals, in the case *Fechteler* v. *Palm Bros. & Co.*, 133 Fed. 462, the court made this statement:

Corporations, *unless expressly authorized*, have no power to enter into partnership either with each other or with individuals. (Italics ours.)

In *Mervyn Investment Co.* v. *Biber*, 184 Cal. 637; 194 Pac. 1037, decided by the Supreme Court of California on January 4, 1921, the court in disposing of a case involving a corporation as a member of a partnership said:

The corporation did through its board of directors assume to exercise this power and for a time operated the business conjointly with Biber. The burden should rest upon it under such circumstances to show that its charter did not permit such a contract. *Belch* v. *Big Store Co.*, 46 Wash. 1, 89 Pac. 174. It has not done this, so far as this record discloses. Even where a corporation is without authority under its charter to form a partnership with another, it may be held liable as a partner to prevent injustice.

The foregoing authorities are considered sufficient by the Board to justify the conclusion that there is no absolute rule that a partnership of which a corporation is a member is not a partnership and should not be taxed as such. In the absence of more evidence as to the

corporation here in question, the action of the Commissioner in treating Wilson Bros. & Co. as a partnership for tax purposes in 1917 will, therefore, not be disturbed.

The only evidence submitted with respect to the claim of the petitioner for an addition to invested capital on account of capital assets which had been charged to expense, was the testimony of one of the partners. He stated that the cost of the assets to be restored was as follows:

| | |
|---|---:|
| Office Building—cost 1906 | $3,000 |
|     Moved and rebuilt in 1912 at cost of | 1,000 |
| Wharf—cost, 1909 | 6,000 |
| Pile Foundations—cost, 1906 | 2,880 |
|   "    "    " 1912 | 2,880 |
| Gangways—cost, 1906–1911 | 10,880 |
|   "    " 1912 | 10,880 |
| Lumber sheds rebuilt in 1912 at cost of | 1,600 |
| Lumber trucks, 106, built 1906–1912, at cost of $35 each | 3,710 |
|     100 built in 1912 at $35 each | 3,500 |

After computing depreciation on the foregoing amounts at 5 per cent from the date of acquisition, it is contended that the balance should be restored to invested capital for 1917.

By means of various questions, many of which were leading, the partner stated that he knew of his own knowledge that the foregoing costs were the true costs at date of acquisition. The Board is not persuaded to accept such a statement at its full value when the character and the amount of the costs are taken into consideration—such as an office building, $3,000, and a wharf, $6,000, etc.—and the further fact that this witness states that he did not begin work for the partnership until about 1906, and then only as a laborer, which would not likely place him in a position to know of his own knowledge of the costs to which he testified.

Upon a consideration of all the evidence, the Board is not convinced that the costs of these assets were as claimed. The claim that these costs exhausted should be restored to invested capital is therefore denied.

The next question is whether the partnership sustained a loss when, in October, 1917, it abandoned the property referred to under the previous issue. The property in question was constructed on premises leased from the Southern Pacific Co. The lease was not introduced in evidence, nor was anything shown as to its terms other than that the lessee, Wilson Bros. & Co., had the right to remove the assets at the expiration of the lease.

On this state of facts the petitioner asks us to assume that the lease was for so long a time as the partnership might desire to use the property, and that, therefore, in determining the loss, sustained de-

preciation based on the physical life of the assets should be computed. The Board has said on many occasions that the burden is on the petitioner under such circumstances to show what the true facts are, and that it can not assume facts for the purpose of a conclusion. In view of our decision of the preceding issue and since there is no satisfactory evidence as to the March 1, 1913, value of the assets, we are not warranted in allowing petitioners' claim for loss.

The fourth issue arises because of a reduction by the Commissioner of petitioner's invested capital at January 1, 1917, on account of an alleged insufficient depreciation taken in prior years. In addition to showing that depreciation had been consistently taken on its assets, the petitioner showed that its practice was to charge many items of a capital nature to expense, which would tend to show an understatement rather than an overstatement of its true surplus account. No evidence was introduced by the Commissioner tending to show that the surplus as reflected by petitioner's books is not correct.

The question here presented has been before the Board on various occasions wherein the principle was enunciated that the surplus as reflected by a taxpayer's books will not be disturbed in the absence of an affirmative showing that the books are not correct. *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87; *Appeal of the Russell Milling Co.*, 1 B. T. A. 194; *Appeal of Rub-No-More Co.*, 1 B. T. A. 228; and *Appeal of Western Star Milling Co.*, 5 B. T. A. 109. Consistent with the foregoing, we must hold that the Commissioner was in error in reducing petitioner's invested capital in the amount of $34,831.85 at January 1, 1917.

In the fifth issue the petitioner contends that the Commissioner was in error in considering the refund received in 1917 on account of workmen's liability insurance paid in 1916 to the State of Washington as income for 1917. The type of insurance here in question is required by the State of Washington to be carried by certain classes of employers, and at the beginning of each year a premium rate is fixed as a basis for payments during the year. After the close of the year the State determines whether refunds are to be made or additional payments required. In this case it was found that a refund was due the petitioner, which was paid in 1917. Is this income to the petitioner in 1917, or should it be considered as applicable to the year 1916, and, therefore, serve to increase petitioner's surplus at January 1, 1917?

We are of the opinion that at December 31, 1916, all factors necessary to a determination of the amount of premiums payable by this petitioner for 1917 had occurred and that the determination of the exact amount to be paid was a mere matter of computation based upon factors then known. All events had happened which would serve to fix the petitioner's liability at this date. The fact that the

State of Washington did not fix the exact amount of liability on this account until after December 31, 1916, does not alter the fact that the liability for premiums for 1916 was a definite liability for that year on the basis of known facts existing at the end of the year.

The Workmen's Compensation Act, Chapter VII, of the General Statutes of Washington, under which these premiums are paid, contemplates that the amount paid during the year shall be tentative only and shall be subject to adjustment after all facts are available at the close of the year.

On the basis of the foregoing, the Board is of the opinion that the refund received in 1917 on account of excess premiums paid in 1916 is not taxable income for 1917, but should serve to reduce operating costs for 1916, and therefore, operate to increase petitioner's invested capital as at January 1, 1917. Cf. *Appeal of Producers Fuel Co.*, 1 B. T. A. 202.

The last issue raised directly by the petition of the partnership is that the Commissioner erroneously used 7 per cent as a basis of determining the excess-profits credit to which the petitioner is entitled under the provisions of section 205 (a) of the Revenue Act of 1917. No evidence was introduced by the petitioner to show wherein the Commissioner was in error and, consequently, his action in this respect will not be disturbed.

We now pass to a consideration of the questions involved in the petitions of F. A. Wilson and W. T. Wilson with respect to depreciation on their several interests in various vessels. During 1916, each of the aforementioned petitioners acquired by gift a 2/64 interest in the S. S. *Svea;* in March, 1917, a 5/100 interest in the S. S. *Idaho;* and in January, 1918, a 5/32 interest in the S. S. *Oregon.* They ask that depreciation be computed on these interests in the vessels on the basis of their cash value at the date of the respective gifts. The basis of the denial of this depreciation is not set forth in the answer other than that it does not conform to the statute, but the deficiency letter sets forth the following reason:

For the purpose of depreciation, it is held that an individual interest in an integral unit is not susceptible of divisibilty thereby creating undivided units of different value.

We find nothing in the statute which would warrant a denial of depreciation on the basis of acquisition cost merely because the asset acquired was a part of an integral unit. Interests in steamships as well as interests in other depreciable assets are bought and sold. Under the revenue statutes a taxpayer is entitled to a reasonable allowance for exhaustion, wear and tear of property used in its trade or business, and when the property acquired is a fractional part of a vessel and this is used in the trade or business, which is

not questioned in this case, the only reasonable manner for a return of his cost to him is on the basis of a spread of the cost of the interest over the remaining life of the vessel. This provides a means to recover capital outlay before taxing income, which it has been held is the purpose of such an allowance. *Appeal of Richmond Dairy Lunch*, 1 B. T. A. 876; *Appeal of William Harris, Jr.*, 2 B. T. A. 156; and *Appeal of Gladding Dry Goods Co.*, 2 B. T. A. 336; *United States* v. *Ludey*, 274 U. S. 295.

The Revenue Act of 1918 and prior acts are silent as to the basis for determining depreciation on property acquired by gift. We are of the opinion, however, that where property is acquired by gift subsequent to March 1, 1913, and prior to January 1, 1921, the capital to be recovered is the fair market value of the property at the date of the gift. *Appeal of Harry W. Bockhoff*, 3 B. T. A. 560. This is also in accord with rulings of the Board with respect to the basis of determining gain or loss on the sale of property acquired by gift. *Appeal of Gilbert Butler*, 4 B. T. A. 756; *Harry F. Robertson* v. *Commissioner*, 5 B. T. A. 748; *Appeal of The Hub, Inc.*, 3 B. T. A. 1259.

Our next consideration is the fair market value of these ships at the date the petitioners acquired their interests. The greater part of the evidence as to these values is contained in the following statement from the deposition of F. A. Wilson, one of the petitioners who received interests in the property:

> The value of the *Svea* was $250,000, which, was set by the revenue agent at the time of the check. The value of the *Idaho* was $395,574.46, and the value of the *Oregon* was $388,888.07. I arrived at these values as follows: The Steamer *Idaho* is 1834 dead weight tons. The value, at the time of gift, was $215.69 a dead weight ton. The steamer *Oregon* is 1803 dead weight tons. Her value is $215.69 per dead weight ton. The dead weight tonnage of these boats were set by the United States Shipping Board. I arrived at the figure of $215.69 per dead weight ton in the following manner: the steamer *Robert C. Sudden* was sold to the French Government, for the firm of Sudden & Christenson, January 2, 1918, for $550,000. In the latter part of 1917 the steamers *Lucinda Hanify*, *Edna Christenson* and *Ryder Hanify*, were sold to the French Government for $550,000 a piece. Each of these steamers is 2550 dead weight tons, which makes the sale price of $215.69 per dead weight ton. These vessels were similar to the *Idaho* and *Oregon* and were built for the Pacific Coast lumber trade the same as the *Idaho* and *Oregon*. Therefore, they were similar vessels, the value per ton would be the same in each case.

Certainly, the Board can not say that the value placed on the S. S. *Svea* by a revenue agent is the correct value since his report is not in evidence and we know nothing as to the basis for his conclusion. The evidence is also unsatisfactory in the case of the other two vessels, as insufficient information is furnished to show that the vessels sold were comparable in value to the ones here in question. For example, the date of construction of the vessels sold is not sub-

mitted, which date would be important in comparing one vessel with another, even though of the same type. Particularly, is this true when it is considered that these vessels are of a relatively short life as evidenced by a depreciation rate of 11-1/9 per cent which was fixed by the revenue agent and accepted by the petitioners, though later changed by the Commissioner to 7 per cent. The further fact exists that the *Idaho* was completed at a cost of approximately $200,000 a few weeks prior to the date of the gift here in question, and a valuation is now being asked of $395,574.46, or an increase of almost 100 per cent. While there was certainly an increase in the value of vessels during the early part of 1917, the Board is of the opinion that more conclusive evidence of value should be furnished than that given in this instance by a person who is to benefit by the valuation contended for. The evidence should be such as will enable the Board to form its own opinion of value.

On a consideration of the entire record the Board can not accept the conclusion of the witness as establishing the values of the respective steamships at the dates in question and, therefore, the contention of the petitioners for additional depreciation based upon the claimed value of the ships at the dates of the respective gifts is denied.

This holding likewise disposes of a claim made in the case of Mrs. Henry Wilson, who similarly acquired an interest in the S. S. *Idaho* at, or about, the same time that the interests were acquired in this vessel by F. A. Wilson and W. T. Wilson.

The next point advanced by the petitioners is that when, on January 2, 1918, Henry Wilson gave to each of his sons, F. A. Wilson and W. T. Wilson, a 5/32 interest in the partnership of Wilson Bros. & Co., of which he was a partner, there came into being a new partnership by agreement of the parties and by operation of law and that, consequently, in determining the distributive shares of each of the partners in the income of the partnership for 1918 and 1919, there should be a revaluation of the partnership assets at January 2, 1918, for depletion and depreciation purposes.

Whether there was a new partnership created on January 2, 1918, or whether for some other reason there should be a revaluation on this date, we consider the evidence insufficient to arrive at a valuation on this date for depletion or depreciation purposes, either for the individuals who acquired their interests in the partnership on this date or for the firm as it existed after this date.

Wilson Bros. & Co. had, on January 2, 1918, certain sawmill equipment, and timberlands which were referred to in the depositions as the Grays Harbor timber and the Lewis County timber.

As to the sawmill equipment, F. A. Wilson testified that on January 1, 1917, the depreciated cost of these assets was $166,000, and that, in

1917, after consultation with the General Appraisal Co. of Seattle, it was determined that the actual value of these assets was $377,000, which the witness stated he considered of his knowledge to be the actual value on January 2, 1918, and is the value for which the petitioners contend. The appraisal was excluded at the hearing as being incompetent and, therefore, we have only the conclusion of this witness, unsupported by other facts. We can not accept this as sufficient proof of value. See *James A. Bradley*, 4 B. T. A. 1179.

The evidence is likewise unsatisfactory as to the timber tracts. F. A. Wilson testified that the value of the Grays Harbor timber had a value on January 2, 1918, of $10 per thousand which he arrived at from the average price at which logs were selling on this date less the cost of logging. No evidence is furnished as to the value of the tract as a whole, the total quantity of timber which a cruise did show or would have shown on January 2, 1918, and other similar factors which would be helpful in determining whether the depletion rate as allowed by the Commissioner is reasonable.

Likewise, as to the Lewis County timber, we are told merely that an adjoining tract of timber was sold for $4 per thousand and asked to find that therefore a depletion rate of $4 per thousand should be allowed to the petitioners. No evidence was furnished as to the comparable nature of the two tracts, either as to quantities involved in either tract or as to how the tracts were located.

In the case of both the Grays Harbor and the Lewis County timber, the petitioners arrived at the total depletion claimed by taking the unit factors as shown above and applying them to the total footage logged as determined by the revenue agent.. So many factors enter into a timber valuation, such as accessibility of the timber from a logging and marketing standpoint, character of timber, present and future availability, etc., that we consider the evidence here furnished as wholly insufficient to enable the Board to determine whether the petitioners are entitled to the relief for which they ask. The depletion as allowed by the Commissioner will, therefore, not be disturbed. *Atkins Lumber Co.*, 1 B. T. A. 317; *A. B. Nickey & Sons*, 3 B. T. A. 173; *Boyne City Lumber Co.*, 7 B. T. A. 36.

The next issue is whether the Commissioner was in error in not treating the incomes of A. B. Johnson and Henry Wilson as community income for the years involved. During these years each was a resident and citizen of California, was married and living with his wife in California, though at the same time each owned an interest in Wilson Bros. & Co., which company had property in the State of Washington from which these petitioners received income.

In the petition the error assigned is that the Commissioner erred in disregarding the laws of California with respect to community

property, but subsequent to the filing of the petition and prior to the submission of evidence the Supreme Court in the case of *United States* v. *Robbins*, 269 U. S. 315, held that under the laws of California the wife has a mere expectancy while living with her husband and that the income received by him would not be taxable as community income. The petitioners now contend that the error was in not applying the laws of Washington as to community property with respect to the income derived from property within the State of Washington.

In *Brookman* v. *Durkee*, 46 Wash. 578; 90 Pac. 914, the Supreme Court of Washington said:

But while the statute, broadly construed, gives countenance to the contention of the respondents, we cannot think it was the intention of the Legislature that no distinction should be made between property acquired wholly within this state by the joint efforts of husband and wife and property acquired by them elsewhere and brought within this state. If it were the intent of the statute that property acquired in another jurisdiction and brought within the state should become community property, its legality might be seriously questioned. It would destroy vested rights. It would take from one of the spouses property over which he or she had sole and absolute dominion and ownership, and vest an interest therein in the other; and if the spouse should be the wife, it would not only take away her absolute title, but would take away from her her right to control and 'manage the property, and make it subject to the separate debts of the husband, whether or not she derived any benefit from their contracting, or had any legal or moral obligation to pay them. Therefore, without entering further into the reasons for the rule, we are clear that personal property acquired by either husband or wife in a foreign jurisdiction, which is by law of the place where acquired the separate property of one or the other of the spouses, continues to be the separate property of that spouse when brought within this state; and it being the separate property of that spouse owning and bringing it here, property in this state, whether real or personal, received in exchange for it, or purchased by it, if it be money, is also the separate property of such spouse.

Likewise, see *In re Burrows' Estate*, 36 Cal. 113; 68 Pac. 488; *Thayer* v. *Clarke*, 77 S. W. 1050 (Texas Civil Appeals); *Young* v. *Templeton*, 4 La. Ann. 254; 50 Am. Dec. 563.

McKay on Community Property, p. 441, par. 651, makes this statement to a similar effect:

The legal effect of extending the law of separate and community property to nonresidents is to subject their property acquired in the state to the laws of the state, but it does not extend that law to their acquisitions made in another state and under the regime of the laws of that state. When property is brought within a community property state the rights vested by the law under which it was acquired are recognized and protected.

There is no satisfactory evidence in the record from which the Board can determine what portion, if any, of the distributive shares

of F. A. Wilson and Henry Wilson of the income of the partnership from sources within the State of Washington was subject to division between them and their wives upon a community property basis. We therefore approve the Commissioner's determination in this regard.  See *Julius Shafer*, 2 B. T. A. 640.

The final issue in the case is whether A. B. Johnson and Henry Wilson should be taxed in 1916 or 1917 on a profit arising from the sale of the S. S. *Columbia*.  The amount of the taxable income is not in issue, the question being, when did the sale take place?

On September 28, 1916, while this ship was on a voyage, Wilson Bros. & Co. gave an option to the Hammond Lumber Co. to sell the vessel for $425,000, less 2½ per cent commission, which option was to run for thirty days.  The option provided that the Hammond Lumber Co. could elect to take delivery either during or upon completion of the charter party upon which the ship was then engaged, and if the former was elected, the Hammond Lumber Co. should assume the performance of the charter party, but if the latter, the remainder of the charter party, after exercise of the option, should be for the account of Wilson Bros. & Co.

In accepting the option, the Hammond Lumber Co. elected to take delivery of the vessel upon completion of the charter party and provided further that in the event of loss or nondelivery of the vessel, Wilson Bros. & Co. should repay the $42,500 tendered, the vessel to be solely at the risk of Wilson Bros. & Co. until delivery.  The remainder of the purchase price was not to be paid until delivery and "the passing of customary and sufficient documents of title with warranty as to the whole of said steamship."  The vessel was delivered in 1917, at which time the remainder of the purchase price was paid.

Was this a sale in 1916 on the basis of the exercise of the option as shown in the communication of October 20, 1916, or was the sale completed in 1917?  In the first place it should be noted that there were certain conditions set out in the acceptance which did not appear in the option, but whether these were sufficient to make of the so-called acceptance a counter offer which would require acceptance we will not decide since it appears that there are other features which preclude this being considered a sale on October 20, 1916.

In the first place neither delivery nor passage of title took place on October 20, 1916.  Assuming the most favorable position for the petitioners, namely, that Wilson Bros. & Co. approved and accepted the letter of October 20, 1916, and thereby made it binding between the contracting parties, this of itself did not pass title to the vessel or make of it more than a binding contract to purchase the vessel upon the fulfillment of certain conditions.  Admittedly, delivery was

not and could not have been effected at this time, and the letter itself provided for a future passing of title when the balance of the purchase price was paid, which was in 1917.

Secondly, both the benefits and burdens with respect to the property remained with the vendor after October 20, 1916, the acceptance expressly providing, " said steamer to be solely at your risk   *   *   * until said steamer is delivered to us." The vendee did not elect to take delivery until completion of the charter party and, therefore, under the terms of the contract, the benefits and burdens accruing during the remainder of the voyage accrued to the vendor.

We are of the opinion that upon approval and acceptance of the letter of October 20, 1916, by the vendors, there came into being an executory contract under which the parties had rights on which they could sue and be sued, but this, of itself, did not make a sale. Where delivery has taken place, but title has not passed, or where the benefits and burdens of ownership accrue to the vendee prior to the making of delivery and transfer of title, difficulty may arise in determining whether a sale has been effected, but when delivery has not been effected, title has not been transferred and the benefits and burdens of ownership remain with the vendor, we fail to see how there can be any question that a sale has not yet been completed.

Williston on Sales, vol. 1, p. 3, makes this statement with regard to a sale:

The most fundamental distinction in the law of sales is between a contract to sell in the future and a present sale. The distinction is often expressed by the terms " executory " and " executed " sales. Whether a bargain between parties is a contract to sell or an actual sale depends upon whether the property in the goods is transferred. If it is transferred, there is a sale, an executed sale, even though the price be not paid.

In *De Bary* v. *Dunne*, 172 Fed. 940, the court stated—

A sale is briefly defined as a contract by which property is transferred from the seller to the buyer for a fixed price in money, paid or agreed to be paid by the buyer.

The Board is of the opinion that the Commissioner was correct in treating the sale as having taken place in 1917, and, consequently, his action in taxing the profits accruing therefrom to A. B. Johnson and Henry Wilson in 1917 is sustained.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN not participating.