EAST COAST OIL COMPANY, S. A., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58180. Promulgated November 8, 1934.

*George L. Buland, Esq., Charles L. Minor, Esq.,* and *Ellis N. Slack, Esq.,* for the petitioner.

*Bruce A. Low, Esq.,* and *T. G. Histon, Esq.,* for the respondent.

#### OPINION.

GOODRICH: In this proceeding petitioner seeks redeterminations of deficiencies in income and excess profits taxes of $35,422.64 for 1919, $348,448.98 for 1920, and $104,085.76 for 1921.

Of the several issues raised by the pleadings, the majority have been disposed of by agreement of the parties, to which effect will be given upon recomputation under Rule 50. Petitioner's claim to special assessment, by order heretofore entered, has been held over to await our decision of the one issue presently submitted. Broadly speaking, that issue is, whether income derived by petitioner during the years mentioned from sales of oil is subject to tax by the United States. The facts are not in dispute. They were presented upon stipulation, enlarged somewhat by additional testimony on the trial record, and need not be set out here in full, for a brief statement will suffice for an understanding of the case.

At the times here material petitioner was a Mexican corporation, engaged in the business of producing, buying and selling oil. It owned extensive properties near Tampico. Certain of its titular officers were citizens and residents of the United States, and it maintained offices at Tucson, Arizona, and Houston, Texas. Its stock was owned by the Southern Pacific Co., a domestic corporation. Its income, taxability of which is here in controversy, arose from sales of oil—all of which it either purchased or produced in Mexico—made under varying circumstances. For convenience, we will treat the sales as of three classes.

The first class includes sales pursuant to oral or memorandum agreements made in Mexico, the oil being there sold and there de-

livered to the purchasers. Respondent now concedes that income arising from such sales is not subject to tax by the United States. Cognizance will be taken of this admission under Rule 50.

The second class includes sales made under written contracts with various domestic corporations and the United States Railroad Administration. The contracts were drawn and executed in the United States, and covered annual periods. Payments for the oil were made to petitioner at its Houston office, upon monthly settlements. Deliveries of the oil were made by petitioner at its wharf near Tampico, Mexico, to tank ships owned or supplied by the purchasers.

The third class includes sales likewise made under written contracts with domestic corporations, drawn and executed in the United States, under which payments were made to petitioner at Houston upon monthly settlements. Deliveries were specified, c. i. f. wharf tanks at Galveston, Texas, or Algiers, Louisiana. Shipments were made by petitioner from its wharf in Mexico by common carriers.

At the time the several contracts were drawn the oil to be delivered, for the most part, was unascertained, and had yet to be produced or purchased by petitioner. Petitioner produced all the oil sold in 1919; produced part and purchased part of the oil sold in 1920; and purchased all the oil sold in 1921.

Respondent has determined a tax upon all the profits derived by petitioner from all its oil sales during the years here before us, regarding such income as taxable under the provisions of section 233 (b) of the Revenue Acts of 1918 and 1921.[1]

For the purposes of this case we need attempt no distinction (if such there be) as to the effect of the quoted provisions of the respective revenue acts. The last clause of the cited section of the 1918 Act—" on the manufacture and disposition of goods within the United States "—means only " disposition of goods", so far as the creation of taxable income is concerned; see *Richard L. Birkin*, 5 B. T. A. 402; *Tootal Broadhurst Lee Co.*, 30 Fed. (2d) 239; affirming 9 B. T. A. 321. In 1921 petitioner produced no oil; it purchased for resale. Therefore, in this case, under the provisions of either act, the matter of production of oil is not material; we are

---

[1] [Sec. 233 (b), Revenue Act of 1918.] In the case of a foreign corporation gross income includes only the gross income from sources within the United States, including * * * all amounts received (although paid under a contract for the sale of goods or otherwise) representing profits on the manufacture and disposition of goods within the United States.

[Sec. 233 (b), Revenue Act of 1921.] In the case of a foreign corporation, gross income means only gross income from sources within the United States determined * * * in the manner provided in section 217.

[Sec. 217 (e).] * * * Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from the country in which sold.

concerned only with the sales. Consequently, the issue here comes down to this: Where were these sales made? If they were made within the United States, as respondent has determined, the income arising therefrom is taxable. If they were made in Mexico, as petitioner contends, the income is not subject to tax by this country.

Respondent points to the contracts, which recite that the seller " hereby sells and agrees to deliver " and the buyer " hereby buys and agrees to receive " an amount of oil between specified maximum and minimum limits. But such terms are not necessarily controlling in a contract of sale. They do not necessarily evidence the actual consummation of the sale; they cannot transpose an executory contract covering unascertained goods into an instrument of present sale. *Brown Lumber Co.*, 9 B. T. A. 719, 730, and cases there cited. *Cunningham Iron Co.* v. *Warren Manufacturing Co.*, 80 Fed. 878. Where, as here, it becomes important to determine just where and when a sale occurs, circumstances beyond mere recitals must be examined.

Respondent points also to the fact that the contracts and the payments under them were made in this country, urging that here was the place of sale. Of course, the place of contract, the place of delivery and of payment, the terms of the agreement, and extraneous circumstances may each have a bearing. But the ultimate goal of the examination of all such considerations is to ascertain when and where the title to the goods passes from the seller to the buyer. It is then and there a sale is consummated—when and where property in the goods passes, when and where the incidents of ownership vest in the vendee. Such is the rule, long and firmly established.[2]

That respondent recognized the rule and long adhered to it, is evidenced by his rulings promulgated during a twelve-year period— an administrative history entitled to weight.[3] It was not until 1930, when he promulgated his G. C. M. 8594, IX–2 C. B. 354, that he sought to depart from it. By that ruling, upon which he bottoms his position in this case, and which he repeats to us as his brief, he proposes the place of contract as controlling in determining the place of sale, in so far as the latter is decisive of the source of income. That is the result he draws from the decision of the Supreme Court in *Compania General* v. *Collector*, 279 U. S. 306. We disagree with his conclusion.

[2] *Abraham B. Johnson*, 7 B. T. A. 820; *W. L. Griffith et al., Executors*, 10 B. T. A. 799; *R. J. Dorn & Co.*, 12 B. T. A. 1102; *Number Nine Plantation*, 23 B. T. A. 974; *Solomon Silberblatt*, 28 B. T. A. 73; *Lucas* v. *North Texas Co.*, 281 U. S. 11; *American Land & Investment Co.* v. *Commissioner*, 40 Fed. (2d) 336; Uniform Sales Act, sec. 1, subd. 2; Williston on Sales (2d ed.), vol. 1, p. 3.

[3] O. D. 651, 3 C. B. 265; O. D. 1100, 5 C. B. 118; A. R. R. 723, I–1 C. B. 113; I. T. 1569. II–1 C. B. 126; I. T. 2068, III–2 C. B. 164.

As we read it, the *Compania General* case in no wise varies the established rule that the place where title passes is the place of sale. There a tax (arising under provisions of the Philippine income tax law similar to the provisions of the 1918 and 1921 Acts here material) was imposed upon net income received from sources within the Philippine Islands.

The taxpayer plaintiff was a corporation which produced and purchased products within the Islands and disposed of them in the United States through a branch agency. Under the law, the profits on the sales were subject to the Philippine tax, unless the sales were made in the United States. The case was submitted to the Court upon a stipulation to the effect that the sales were made in the United States, subject however to final confirmation by the plaintiff in the Philippines. Under that stipulation the Court could not but conclude that when confirmation was given, the sale became complete, and that it was not complete until confirmation was given. The stipulation was consistent only with the proposition that property in the goods passed, *eo instanti*, upon the confirmation made in the Philippines—that the place of sale is where the final act of the seller, causing title to pass, was done. And to that effect was respondent's argument to the Court.[4] The Court did not say that the place where is made an executory contract of sale is necessarily the place of sale; it did not set aside the rule that a sale is consummated when and where the property in the goods passes. See *Briskey Co.*, 29 B. T. A. 987.

So, the fundamental inquiry here is, Where did the property in the oil sold by petitioner pass from it to the purchasers? As to the oil shipped to the purchasers by common carrier there can be no doubt; the law is clear. These sales were made under c. i. f. contracts (often judicially defined); that is, contracts in which the agreed price includes cost of goods, insurance upon them during transit, and the freight from point of shipment. Under such contracts, the seller has performed his part when he has loaded the goods on the carrier, secured the insurance, and forwarded to the purchaser the proper shipping documents. At that time, and at the place of shipment, title passes to the purchaser; thereafter the goods, and the risks, are his.[5] The record shows that petitioner fully per-

---

[4] See the seventh point in respondent's brief on hearing of writ of certiorari.

[5] *The Hans Maersk*, 266 Fed. 806; *Kinglig Jarnvagsstyrelsen* v. *Dexter & Carpenter*, 32 Fed. (2d) 195; *Thames & Mersey Marine Insurance Co., Ltd.* v. *United States*, 237 U. S. 19; *Mee* v. *McNider*, 17 N. E. 424 (N. Y.); *Seaver* v. *Lindsay Light Co.*, 135 N. E. 329 (N. Y.); *Smith Co., Ltd.* v. *Moscahlades*, 183 N. Y. S. 500; *Masondray & Co.* v. *Grace & Co.*, 30 Fed. (2d) 647; certiorari denied, 279 U. S. 863. See authorities collected in notes 10 A. L. R. 701 and 20 A. L. R. 1236; also Williston on Sales (2d ed.), sec. 280 (c).

formed in Mexico all its obligations under these contracts. It follows that property in the oil passed in Mexico to the purchasers, and the sales were there made. Consequently, the profits from those sales, made without the United States, are not subject to the tax respondent seeks to impose.

Scarcely more difficulty arises concerning the sales made to the purchasers who furnished their own tankers to transport the oil. The contracts provide for deliveries to be made by petitioner into the purchasers' ships at the point of shipment in Mexico, thus stating expressly the terms implied by the classification f. o. b.; that is, in this case, placed by the seller, free of expense, on board a vessel for transportation to the buyer.[6] Under such contracts, property in the goods passes, and the sale is thus completed, upon delivery of the goods by the vendor to the carrier (which, in this case, was the vendee itself).[7] That delivery was made in Mexico; consequently, the sales were there made, and respondent erred in attempting to subject to tax the profit arising from them.

Our agreement with petitioner's contentions finds further support in two circumstances of the case. When the contracts were made, the oil to be sold was unascertained, unappropriated. That fact prevented a completed sale instanter, for there can be no transfer of title to that which is not *in esse*.[8] Further, the fact that these sales were made on credit evidences a passing of title—an early relinquishment of it by the seller [9]—prior to payment for the goods, thus here eliminating the place of payment as being determinative of the place of sale.

The conclusion we have reached makes unnecessary consideration of petitioner's claim to special assessment.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MATTHEWS did not participate in the consideration of or decision in this report.

SMITH dissents.

---

[6] Williston on Sales (2d ed.), sec. 280 (a); idem, 280 (j), American Foreign Trade Definitions, 26 C. J. 745.

[7] Williston on Sales (2d ed.), sec. 278 (a), 280 (b); *United States* v. *Andrews & Co.,* 207 U. S. 229; *Hill Veneer Co.* v. *Monroe,* 189 Fed. 834; *Nelson Bros. Coal Co.* v. *Perryman-Burns Coal Co.,* 48 Fed. (2d) 99. See Notes 44 L. R. A. N. S. 435; 16 C. J. 195.

[8] Contracts to be fulfilled by acquiring and delivering the subject matter to the purchasers are executory contracts. *Abraham B. Johnson,* 7 B. T. A. 820; *Briskey Co.,* 29 B. T. A. 987; *Rosenberg Bros. & Co.* v. *Beales et al.,* 205 Pac. 18; *Montauk Ice Cream Co.* v. *Daigger Co.,* 126 S. E. 681.

[9] Williston on Sales (2d ed.), sec. 269.