ELSTON COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GADIAN COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

STANART COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 96604, 96605, 96606. Promulgated June 25, 1940.

*Daniel B. Priest, Esq.*, for the petitioners.
*W. Frank Gibbs, Esq.*, for the respondent.

**OPINION.**

HARRON : The first question is whether the gains realized by petitioners during the taxable year from sales of American and Japanese bonds were gross income from sources within the United States, under section 119 of the Revenue Act of 1934. As foreign corporations, petitioners were taxable only on gross income from sources within the United States, under section 231 (a) of the Revenue Act of 1934, the provisions of which are set forth in the margin.[2]

In their income tax returns for the taxable year petitioners reported the gains realized during the taxable year from sales of American and Japanese bonds as gross income from sources without the United States and did not include the gains in taxable gross income. Respondent determined that the gains were gross income from sources within the United States and included the gains in taxable gross income.

---

[2] SEC. 231. GROSS INCOME.

(a) GENERAL RULE.—In the case of a foreign corporation gross income includes only the gross income from sources within the United States.

The provisions of section 119 of the Revenue Act of 1934, insofar as they are pertinent to the question here presented, are as follows:

SEC. 119. INCOME FROM SOURCES WITHIN UNITED STATES.

(a) GROSS INCOME FROM SOURCES IN UNITED STATES.—The following items of gross income shall be treated as income from sources within the United States:

\* \* \* \* \* \* \*

(6) SALE OF PERSONAL PROPERTY.—For gains, profits, and income from the sale of personal property, see subsection (e).

(e) INCOME FROM SOURCES PARTLY WITHIN AND PARTLY WITHOUT UNITED STATES.—\* \* \* Gains, profits, and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold \* \* \*.

The words "the country in which sold", as used in subsection (e) mean the country in which title to the personal property passes from the vendor to the vendee. *East Coast Oil Co., S. A.*, 31 B. T. A. 558; affd., 85 Fed. (2d) 322; certiorari denied, 299 U. S. 608; *Hazleton Corporation*, 36 B. T. A. 908; *Ardbern Co., Ltd.*, 41 B. T. A. 910. Here, the personal property was ordinary coupon bonds payable to bearer, and title to the bonds passed where the bonds were delivered from the vendors to the vendees. *Gruntal* v. *National Surety Co.*, 254 N. Y. 468; 173 N. E. 682, 684; *Pratt* v. *Higginson*, 230 Mass. 256; 119 N. E. 661, 663.

Petitioners concede that the bonds which they sold during the period from April 30 to October 30, 1934, inclusive, were sold and delivered to vendees in the United States through O'Brien & Williams and Laidlaw & Co., as brokers, and that the gains realized therefrom were income from sources within the United States. Therefore, respondent correctly included in each petitioner's taxable gross income for the taxable year the gains realized by it from sales of bonds during the period from April 30 to October 30, 1934, inclusive.

Petitioners contend that the bonds which they sold during the period from October 30, 1934, to April 30, 1935, inclusive, were sold and delivered in Canada to O'Brien & Williams, Craig, Ballantyne & Co., the Monetary Bond Corporation, and the Bank of Montreal, *as dealers*, and that, thus, the gains realized from the bonds sold during that period were income from sources outside the United States. On the other hand, respondent contends that the bonds which petitioners sold during that period were sold and delivered to vendees in the United States through O'Brien & Williams, Craig, Ballantyne & Co., the Monetary Bond Corporation, and the Bank of Montreal, *as brokers*, and that, thus the gains realized from the bonds sold during that period were income from sources within the United States. Therefore, the basic question is whether the relationship between

petitioners, on the one hand, and O'Brien & Williams, Craig, Ballantyne & Co., the Monetary Bond Corporation, and the Bank of Montreal with respect to the sales of bonds during the period from October 30, 1934, to April 30, 1935, inclusive, was that of customer and dealer or that of customer and broker. There is little dispute as to the facts. Since the facts underlying the sales of American bonds are somewhat different from the facts underlying the sales of Japanese bonds, the relationship between petitioners and O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond Corporation with respect to the sales of American bonds, and the relationship between petitioners and the Bank of Montreal with respect to the sales of Japanese bonds will be considered separately.

The facts clearly show that with respect to the sales of American bonds during the period from October 30, 1934, to April 30, 1935, inclusive, the relationship between petitioners, on the one hand, and O'Brien & Williams, the Monetary Bond Corporation, and Craig, Ballantyne & Co., on the other hand, was that of customer and dealer, or, in other words, that of vendor and vendee. O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond Corporation used the language "we have * * * Bought from you" in the confirmation notices sent to petitioners; they charged no commission to petitioners; and they bought from petitioners at a lower price than that at which they resold to Wood, Struthers & Co. These particular facts are strong evidence that the relationship was that of customer and dealer, rather than that of customer and broker.[3] Furthermore, the fact that O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond Corporation paid for the bonds by accepted checks before receiving delivery of the bonds from petitioners, and before being paid for the bonds by Wood, Struthers & Co., shows that the relationship was that of customer and dealer.

The conclusion that the relationship was that of customer and dealer is established conclusively by the testimony of officers of the dealers to the effect that the parties intended that the relationship was to be that of customer and dealer and that after delivery of the bonds to the dealers they understood that the risk of loss was to fall on them and not on petitioners. In the last analysis, the nature of the relationship is governed by the intention of the parties.[4]

There is little evidence in the record to support respondent's contention that the relationship between petitioners, on the one hand, and O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond

[3] See Meyer, The Law of Stockbrokers and Stock Exchanges, 1933 Cumulative Supplement, sec. 43-a, pp. 33–35. See also Geo. S. Bates and Wm. O. Douglas, Stock "Brokers" As Agents and Dealers, 43 Yale Law Journal, pp. 46, 59–61.

[4] See Meyer, The Law of Stockbrokers and Stock Exchanges, 1933 Cumulative Supplement, sec. 43-a, p. 35.

Corporation, on the other hand, was that of customer and broker with respect to the sales of American bonds during the period from October 30, 1934, to April 30, 1935, inclusive. The mere fact that prior to October 30, 1934, O'Brien & Williams acted as brokers with respect to the sales of the American bonds does not compel the conclusion that subsequent to October 30, 1934, the relationship of customer and broker continued.[5] It should be noted that the Monetary Bond Corporation never acted as broker, but always as dealer, and that there is no evidence that Craig, Ballantyne & Co. ever acted as brokers for petitioners either prior to or subsequent to October 30, 1934. Nor does the mere fact that O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond Corporation contracted to resell the bonds before they purchased the bonds from petitioners tend to show that the relationship between petitioners and the dealers was that of customer and broker. There is no evidence to show that the sales to the dealers were colored by any secret understanding between the parties or that petitioners knowingly were connected in any way with the resales by the dealers to Wood, Struthers & Co.

There is little merit to the arguments urged by respondent in support of the contention that the relationship between petitioners, on the one hand, and O'Brien & Williams, Craig, Ballantyne & Co., and the Monetary Bond Corporation, on the other hand, was that of customer and broker. Respondent's main argument is that the manner in which each of the dealers computed the price at which it offered to purchase a block of bonds from the respective petitioner shows that the relationship was that of customer and broker. Respondent points, first, to the fact that each dealer converted into Canadian funds the net amount to be received from Wood, Struthers & Co. for a block of bonds and then subtracted from the result the amount of a stamp tax due the Province of Quebec on the resale of the block of bonds to Wood, Struthers & Co. and the cost of transmitting the block of bonds to Wood, Struthers & Co. These computations were necessary in order to enable the dealer to offer the respective petitioner a price for the block of bonds at which the dealer could realize a profit, and clearly do not support respondent's contention that the relationship was that of customer and broker. Respondent points, next, to the fact that the dealer also subtracted from the net amount to be received from Wood, Struthers & Co. for the block of bonds a profit at the rate of $2.50 per thousand dollar bond, which rate of profit was 50 cents less than the normal rate of commission and was the same as the rate of commission charged by O'Brien & Williams with respect to the sales of bonds from April 30 to October 30, 1934,

[5] See Meyer, The Law of Stockbrokers and Stock Exchanges, 1933 Cumulative Supplement, sec. 43-a, p. 33.

inclusive. The mere fact that the dealers' rate of profit was approximately the same as the normal rate of commission and the same as the rate of commission charged by O'Brien & Williams when it acted as broker for petitioners does not warrant an inference that the relationship was that of customer and broker. See *Adams* v. *Thayer*, 86 N. H. 555; 171 Atl. 771. It should be pointed out that the record shows that the dealers each decided that a profit at the rate of $2.50 per thousand dollar bond was a reasonable profit in view of the large quantity of transactions, and that petitioners had no knowledge as to the rate of profit realized by the dealers. Respondent points with special emphasis to the fact that although petitioners delivered the bonds to, and received payment from, the dealers prior to the settlement date provided in the confirmation notices sent by Wood, Struthers & Co. to the dealers, petitioners received from the dealers the interest on the bonds from the last coupon date up to the settlement date provided in the confirmation notices sent by Wood, Struthers & Co. to the dealers. However, the confirmation notices sent by the dealers to petitioners also contained the same settlement date which was contained in the confirmation notices sent by Wood, Struthers & Co. to the dealers, and thus, the fact that petitioners received from the dealers the interest on the bonds from the last coupon date up to the settlement date provided in the confirmation notices sent by Wood, Struthers & Co. to the dealers does not give rise, *per se*, to any inference that the relationship was that of customer and broker.

Likewise, the facts clearly show that with respect to the sales of Japanese bonds during the period from January 4 to April 30, 1935, inclusive, the relationship between petitioners and the Bank of Montreal was that of customer and dealer, or, in other words, that of vendor and vendee. The Bank of Montreal used the language "Confirmation of:—Purchase from the Royal Trust Company" in the confirmation notices sent to the Royal Trust Co. which acted as petitioners' broker; and though the Royal Trust Co. charged a commission to petitioners, there is no evidence to show that the Bank of Montreal charged a commission to petitioners.[6] Furthermore, an officer of the Royal Trust Co. testified that it was understood and intended that the relationship between petitioners and the Bank of Montreal was to be that of customer and dealer. Even if the relationship between petitioners and the Bank of Montreal were that of customer and broker, there is no evidence to show that the Japanese bonds were sold in the United States either in the taxable year or at any other time.

[6] See Meyer, The Law of Stockbrokers and Stock Exchanges, 1933 Cumulative Supplement, sec. 43–a, p. 34.

Respondent concedes that there is no direct evidence which tends to show that the relationship between petitioners and the Bank of Montreal was that of customer and broker or that the Japanese bonds were sold by the Bank of Montreal in the United States. However, respondent points to the fact that the Japanese bonds were not listed on any Montreal exchange and to the fact that the Bank of Montreal paid slightly different prices for lots contained in each block of Japanese bonds purchased from petitioners. From these facts respondent attempts to draw the inference that the Bank of Montreal, as broker, sold the Japanese bonds in the United States for petitioners' respective accounts. The inference is too strained to warrant further consideration.

Since the American and Japanese bonds which petitioners sold during the period from October 30, 1934, to April 30, 1935, inclusive, were sold and delivered to dealers in Canada, the gains realized therefrom were income from sources outside the United States, and respondent erred in including such gains in petitioners' taxable gross income for the taxable year.

The second question is whether the gains realized by petitioners during the taxable year from the redemption of bonds of the New York Central & Hudson River Railroad were gross income from sources within the United States within the meaning of section 119 of the Revenue Act of 1934. In their income tax returns for the taxable year petitioners reported the gains realized from the redemption of the bonds as gross income from sources outside the United States and did not include the gains in taxable gross income. Respondent determined that the gains realized from the redemption of the bonds were gross income from sources within the United States and included the gains in taxable gross income.

Subsection (a) of section 119 provides that the following items of gross income shall be treated as gross income from sources within the United States: (1) Interests; (2) dividends; (3) compensation for personal services; (4) rentals and royalties; (5) gains, profits, and income from the sale of real property; (6) and gains, profits, and income from the sale of personal property. In subsection (f) of section 119 it is provided that the word "sale" as used in section 119 includes the word "exchange." Subsection (e) of section 119 provides in part that items of gross income other than those specified in subsection (a) shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

Petitioners contend that the gains from the redemption of bonds were not gross income from sources within the United States because gross income from sources within the United States is limited

to the six items of gross income specifically mentioned in subsection (a) and because such gains were not gains from the sale or "exchange" of personal property within the scope of item sixth, subsection (a). On the other hand, respondent contends that the gains from the redemption of the bonds were gross income from sources within the United States because gross income from sources within the United States is not limited to the six items of gross income specifically mentioned in subsection (a) and because such gains were gains from the "exchange" of personal property, as provided by section 117 (f) of the Revenue Act of 1934, the pertinent provisions of which are set forth in the margin.[7]

Gross income from sources within the United States is not limited to the six items of gross income specifically mentioned in subsection (a). *Helvering* v. *Suffolk Co., Ltd.*, 104 Fed. (2d) 505, in which the Circuit Court stated that the comprehensive language of subsection (e) shows that Congress intended "to cover items of income other than those specifically mentioned in the previous subsections" and "to include in taxable income all income derived from sources within the United States." Moreover, the Board has held that gains from the redemption of bonds in the United States constitute gross income from sources within the United States. *Hubert De Stuers*, 26 B. T. A. 201, in which the Board stated with reference to section 217 of the Revenue Act of 1926, which corresponds to section 119 of the Revenue Act of 1934, in part as follows:

> Counsel for the petitioner argues, * * * that the profits arising from these transactions are not taxable to the petitioner under the provisions of section 217 (a) of the Revenue Act of 1926, which defines income from sources within the United States, but does not include profits such as arose in this case. However, the provisions of section 217 (a) are not an all inclusive definition of income from sources within the United States for the purpose of determining the net income of nonresident alien individuals. This is apparent from section 217 (e), which provides that items of gross income, other than those specified in subdivision (a), shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner, with the approval of the Secretary. Subdivision (e) contains also some specific provisions in regard to gains from the purchase and sale of personal property. When section 217 is read as a whole and the rules and regulations prescribed by the Commissioner with the approval of the Secretary considered, articles 324 and 328 of Regulations 69, it is apparent that the profit from the transactions in question in this case must be considered to be income from sources within the United States.

Since the New York Central & Hudson River Railroad bonds were redeemed in the United States, the *De Stuers* case is controlling.

---

[7] SEC. 117. CAPITAL GAINS AND LOSSES.

* * * * * * *

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this title, amounts received by the holder upon the retirement of bonds * * * shall be considered as amounts received in exchange therefor.

Thus, the gains realized from the redemption of the bonds were gross income from sources within the United States, and respondent correctly included such gains in petitioners' taxable gross income for the taxable year. In view of this conclusion, it is not necessary to pass upon respondent's contention that the gains from the redemption of the bonds were gains from the "exchange" of personal property, as provided in subsection (f) of section 117 of the Revenue Act of 1934.

The final question is whether petitioners are subject to the surtax on personal holding companies imposed by section 351 of the Revenue Act of 1934. Petitioners filed personal holding company returns for the taxable year. As the result of the credit of 20 percent of adjusted net income and the credit for dividends paid during the taxable year, which credits are allowed by section 351, the returns each disclosed no undistributed adjusted net income and thus no liability for surtax under section 351.[8] Respondent determined deficiencies in surtax under section 351 as the result of including in petitioners' taxable gross income for the taxable year the gains realized from the sales of American and Japanese bonds and from the redemption of the bonds of the New York Central & Hudson River Railroad Co. In an amended petition each petitioner alleges that during the taxable year it was a foreign corporation, having no office and transacting no business in the United States, and that during the taxable year all of its stock was owned by nonresident aliens; that Congress did not intend that a foreign corporation whose stock was owned entirely by nonresident aliens was to be subject to the surtax imposed by section 351; and that, therefore, the Commissioner erred in determining that it was subject to the surtax imposed by section 351.

In view of the conclusion that the gains realized by petitioners from the sales of American and Japanese bonds during the period from October 30, 1934, to April 30, 1935, inclusive, were not income from sources within the United States, it is not necessary to pass upon the question as to whether Congress intended that a foreign corpora-

---

[8] SEC. 351. SURTAX ON PERSONAL HOLDING COMPANIES.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid, for each taxable year, upon the undistributed adjusted net income of every personal holding company a surtax * * *

      *         *         *         *         *         *         *

(b) DEFINITIONS.—As used in this title—

      *         *         *         *         *         *         *

(2) The term "undistributed adjusted net income" means the adjusted net income minus the sum of:

(A) 20 per centum of the excess of the adjusted net income over the amount of dividends received from personal holding companies which are allowable as a deduction for the purposes of the tax imposed by section 13 or 204;

      *         *         *         *         *         *         *

(C) Dividends paid during the taxable year.

tion whose stock was owned entirely by nonresident aliens was to be subject to the surtax imposed by section 351. Even if Congress intended, as respondent contends, that a foreign corporation whose stock was owned entirely by nonresident aliens was to be subject to the surtax imposed by section 351, the credit of 20 percent of adjusted net income and the credit for dividends paid during the taxable year would exceed the adjusted net income of each petitioner, and would result in no undistributed adjusted net income subject to surtax, under section 351, and thus, in no surtax liability. This was conceded by respondent at the hearing and is pointed out by petitioners in their reply brief.

During the taxable year petitioners each incurred certain ordinary and necessary expenses in the conduct of their businesses, a ratable part of which expenses were deductible under section 232 of the Revenue Act of 1934 and article 119-10 of Regulations 86, the pertinent provisions of which are set forth in the margin.[9] None of the petitioners took a deduction for a ratable part of its expenses in its income tax return for the taxable year. In determining the deficiencies respondent allowed each petitioner a deduction for a ratable part of its expenses, and in computing the ratable part of expenses respondent included the gains realized from the sales of the American and Japanese bonds during the period from October 30, 1934, to April 30, 1935, inclusive, as gross income from sources within the United States. In view of the conclusion that the gains realized from the sale of the American and Japanese bonds during the period from October 30, 1934, to April 30, 1935, inclusive, were not gross income from sources within the United States, the ratable part of expenses allowed each petitioner as a deduction should be recomputed, as requested by respondent in an amended answer and also urged by petitioners in their briefs.

*Decision will be entered under Rule 50.*

---

[9] SEC. 232. DEDUCTIONS.

In the case of a foreign corporation the deductions shall be allowed only if and to the extent that they are connected with income from sources within the United States; and the proper apportionment and allocation of the deductions with respect to sources within and without the United States shall be determined as provided in section 119, under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

ART. 119-10. *Apportionment of deductions.*—From the items specified in articles 119-1 to 119-6 as being derived specifically from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of any other expenses, losses, or deductions which can not definitely be allocated to some item or class of gross income. The remainder shall be included in full as net income from sources within the United States. The ratable part is based upon the ratio of gross income from sources within the United States to the total gross income.