Jorge Pasquel v. Commissioner.
Pasquel v. Commissioner
Docket No. 38425.
United States Tax Court
1953 Tax Ct. Memo LEXIS 15; 12 T.C.M. (CCH) 1431; T.C.M. (RIA) 54002; December 23, 1953
*15 Where petitioner, a noresident alien individual, furnished $100,000 to Higgins, Inc., a New Orleans shipbuilding corporation, to be used to pay the balance of the purchase price on two war surplus landing ships previously contracted for by Higgins, Inc., and the ships were sold within three months, petitioner receiving his entire investment and an additional $75,000 representing 50 per cent of the profits on the purchase and sale, held, petitioner's participation in this single, isolated transaction did not constitute engaging in a trade or business in the United States as contemplated by Sec. 211 (b) of the Internal Revenue Code. Richard B. Montgomery, Jr., Esq., 1105 Maritime Building, New Orleans, La., for the petitioner. M. Clifton Maxwell, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in the income tax of petitioner for the calendar year 1947 in the amount of $43,861.50 representing the tax on petitioner's $75,000 share of the profits on a transaction involving the purchase and sale of two war surplus landing ships. In computing the deficiency, no credit was given *16 for $22,500 withheld at the source. Petitioner concedes his liability to the extent of that amount and respondent has agreed that in the administrative processes following the decision of this Court petitioner is to be credited with the $22,500 withheld. The sole issue to be decided is whether petitioner was taxable for the year 1947 as a nonresident alien engaged in a trade or business in the United States as contemplated by section 211 (b) of the Code. Findings of Fact Petitioner, a citizen and resident of Mexico, filed no United States income tax return for 1947. In the latter part of April, 1947, Higgins, Inc., a New Orleans shipbuilding corporation, arranged with the United States Maritime Commission for the purchase of two war surplus landing ships known as LST's for $75,000 each. After making a deposit on the purchase price, Higgins, Inc., requested the permission of the Maritime Commission to defer payment of the balance and delivery of the vessels for a period of three months. Permission was further requested to place watchmen on the ships until such time as the ships were removed. The purpose of the delay was to obtain additional time in which to raise the balance *17 of the purchase price since Higgins, Inc., was in bad financial condition at that time. In June, 1947, Andrew Higgins, Jr., then vice-president of Higgins, Inc., called petitioner in Mexico City by telephone to inquire as to whether he would be interested in participating in the ship transaction. Shortly thereafter, Andrew Higgins, Jr., traveled to Mexico City to discuss the matter further with petitioner. The two men agreed that petitioner would supply $100,000 to conclude the purchase of the ships, with petitioner and Higgins, Inc., to divide equally any profits arising from resale of the vessels. Andrew Higgins, Jr., assured petitioner verbally that he would suffer no losses through the transaction and that he could earn as much as $50,000 to $100,000 but in no event less than $25,000. On June 23, 1947, petitioner cabled the $100,000 to New Orleans. At that time, the ships were at Claremont Harbor, Virginia. Neither petitioner nor Higgins, Inc., then knew when nor to whom the ships could be sold. The ships in question had substantial amounts of machinery and equipment aboard and a greater profit might be realized through the sale of that machinery and equipment apart from the *18 ships. It was not known whether the ships could be sold as they were, or whether it would be necessary to convert them for peacetime use. Andrew Higgins, Jr., regarded the advances made by petitioner as essentially a loan and felt that he had at least a moral obligation to return the $100,000 with a minimum profit of $25,000 in any event. On June 27, 1947, Andrew Higgins, Jr., caused to be made a note in the amount of $125,000 payable by Higgins, Inc., to Higgins, Inc., endorsed in blank and secured by a recorded chattel mortgage on one of the vessels in question. The mortgage was in favor of one Gus B. Baldwin, Jr., a nominee. Although neither document was ever delivered to petitioner nor did he have any knowledge of their existence, they were caused to be made for his protection. Andrew Higgins, Jr., took this action in an effort to prevent losses to petitioner in the event of a worsening of the financial condition of Higgins, Inc. The avoidance of petitioner's name in the documents was designed to conceal the financial difficulties of Higgins, Inc., from petitioner who had an excellent opinion of that corporation. Shortly thereafter, Andrew Higgins, Jr., met in New York City *19 with representatives of the Argentine Naval Commission who expressed interest in the two ships. In August, 1947, the vessels were sold to the Government of Argentina, which made a down-payment on the purchase price at that time. Immediately thereafter petitioner's $100,000 was returned, along with an additional $75,000 as his share of the profits, less $22,500 withheld by Higgins, Inc., and sent to the Treasury Department with Form #1042, Annual Return of Income Tax To Be Paid at Source. These amounts were paid from the down-payment made by Argentina. The ships were subsequently converted under the direction of Higgins, Inc., by a subcontractor. Petitioner had nothing to do with the conversion of the vessels. At no time during the year 1947 did petitioner enter the United States, nor was he involved in any other transactions in this country during that year. Opinion ARUNDELL, Judge: The primary issue in this case is whether petitioner, a nonresident alien, was, by reason of the transaction in question, engaged in trade or business in the United States and thus taxable on the profits from that transaction under section 211 (b) of the Code. It is respondent's position that the *20 relationship between petitioner and Higgins, Inc., constituted a joint venture to be treated, for tax purposes, as a partnership, as defined by section 3797 (a)(2) of the Code. [1]
The facts herein differ somewhat from the ordinary case in which two or more parties agree initially to undertake a joint project. Here the purchase of the ships had already been contracted for by Higgins, Inc., and that corporation brought petitioner into the transaction only as an expedient means of financing an existing commitment which it could not meet by itself. When Higgins, Inc., agreed to resell the vessels to the Argentine Government, petitioner's participation was ended by the repayment of his $100,000, together with a handsome profit immediately after a downpayment was made by Argentina, notwithstanding *21 the fact that conversion of the vessels under the direction of Higgins, Inc., had not yet been completed. The recognition by Andrew Higgins, Jr., of at least a moral obligation to see that the advanced sum was repaid to petitioner with a bonus of not less than $25,000, accompanied as it was by the execution by Higgins, Inc., of a chattel mortgage to protect petitioner, lends some support to petitioner's argument that the transaction should be regarded as a loan. However, even if we assume that the transaction was in fact a joint venture as contended for by respondent, we think that petitioner was not engaged in a trade or business in the United States within the meaning of section 211 (b). In European Naval Stores Co., S.A., 11 T.C. 127, the petitioner, a Belgian corporation, had purchased certain naval stores in the United States in 1939. Delivery of the goods could not be accomplished because of embargoes following occupation of Belgium by the German armies. The vendor placed the goods in public storage until 1942 when, for the protection of the petitioner, it repurchased the goods without petitioner's knowledge. Because of substantial price increases during the *22 years the material was in storage, there were profits from the repurchase which were credited to petitioner's account. In holding that the Belgian corporation was not engaged in a trade or business in the United States, we said: "The meaning of the phrases 'engaged in business,' 'carrying on business,' and 'doing business' were defined by the Circuit Court of Appeals for the Third Circuit in Lewellyn v. Pittsburgh, B. & L.E.R. Co., 222 Fed. 177. It was stated therein that, 'The three expressions, either separately, or connectedly, convey the idea of progression, continuity, or sustained activity. "Engaged in business" means occupied in business; employed in business. "Carrying on business" does not mean the performance of a single disconnected business act. It means conducting, prosecuting, and continuing business by performing progressively all the acts normally incident thereto, and likewise the expression "doing business," when employed as descriptive of an occupation, conveys the idea of business being done, not from time to time, but all the time. * * *'" Respondent attempts to limit the application of that decision to the unique fact situation therein, but we *23 said, after pointing out that the petitioner had never before sold its goods in the United States: "Such a sale, even when viewed without regard for the unusual circumstances which surrounded it, could hardly be held to constitute the petitioner's engaging in a trade or business in the United States. (Italics supplied.)" In Linen Thread Co., 14 T.C. 725, the petitioner, a foreign corporation, was attempting to establish that it was engaged in trade or business in the United States. In support of that contention, it pointed to two transactions during the year in question involving its resident agent in the United States. On one of the transactions, petitioner, in Scotland, received an order from an individual in New York City for a quantity of thread which was shipped to the resident agent for delivery and collection of the purchase price. The resident agent did "the paper work" on the other transaction involving a shipment from petitioner to its subsidiary in the United States. Although the case was decided on other grounds, we said: "There is nothing of continuity or of sustained activity in these two small isolated transactions so as to warrant our regarding petitioner *24 as engaged in trade or business in the United States through its New York office on the strength of them." In the case at bar, Higgins, Inc., had already contracted with the United States Maritime Commission for the purchase of the vessels and made a down-payment at the time petitioner became involved. He furnished $100,000 for the completion of the purchase and within three months all of his money was returned, together with his 50 per cent share of the profits on the sale. At no time during the year did petitioner enter the United States, nor was he involved in any other transactions in this country. We think that petitioner's participation in this single and isolated transaction does not amount to engaging in trade or business in the United States as contemplated by section 211 (b) of the Code. It follows that respondent's determination of a deficiency in the amount of $43,861.50 was incorrect. The parties are agreed that there is a technical deficiency of $22,500 against which the $22,500 withheld at the source is to be credited so that petitioner will not be liable for any further payments. Decision will be entered under Rule 50. Footnotes
1. The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.↩