**UNITED STATES of America,**
**Plaintiff,**

v.

Israel **BALANOVSKI**, Alice Devine, Samuel Bernardo Horenstein, Compania Argentina De Intercambio Comercial, I. Balanovski Y Cia (sometimes called "Cadic"), a co-partnership, Brown Brothers Harriman & Company, a co-partnership, and Marine Midland Trust Company of New York, a corporation, Defendants.

United States District Court
S. D. New York.

March 11, 1955.

Supplemental Opinion May 19, 1955.

J. Edward Lumbard, U. S. Atty., for the Southern Dist. of N. Y., New York City, for plaintiff, Thomas C. Burke, New York City, of counsel.

Donald L. Stumpf, New York City, for defendants, Harold H. Corbin and Edward J. Bennett, New York City, of counsel.

PALMIERI, District Judge.

In this action the United States seeks to recover income taxes from Messrs. Balanovski and Horenstein, two nonresident aliens who are residents and citizens of Argentina. The Government has served a notice of levy on two New York banks in which certain funds are now on deposit to the credit of the defendant Balanovski. It wants to enforce this levy and to secure an in personam judgment against Messrs. Balanovski and Horenstein for the amount of the taxes allegedly due. Defendants deny that any taxes are due, and question whether certain assessments made by the Government are valid and whether this Court has in personam jurisdiction over them.

At all times material to the instant case defendants Balanovski and Horenstein were members of an Argentine partnership, Compania Argentina de Intercambio Comercial (Cadic). Balanovski entered the United States as a nonimmigrant late in 1946 and remained in the United States for a period of some eight months. During his stay in the United States Balanovski purchased trucks and equipment for Cadic from United States suppliers. From some of these suppliers he received, for Cadic, payments called discounts for quantity purchases. The trucks and equipment were sold by Cadic to an agency of the Argentine Government, Instituto Argentino de Promocion del Intercambio (IAPI). It is the sum of (1) the amount paid to Cadic as quantity discounts by United States suppliers and (2) the profits made on the sales to IAPI that the Government seeks to tax.

The facts are not disputed. Cadic was represented by Balanovski during his stay in the United States, and when Balanovski left the United States he gave the defendant Devine a power of attorney to act in his behalf in making contracts and in transacting business with several banks. While in the United States Balanovski located suppliers who had goods to sell and sometimes travelled to various cities to inspect goods offered for sale or purchased by him. After receipt of an offer from a supplier Balanovski would communicate with Horenstein, his partner in Argentina, who would submit an offer to IAPI. If IAPI accepted the offer, Horenstein would notify Balanovski and the latter would accept the supplier's offer. In the meantime IAPI would cause a letter of credit in favor of Balanovski to be opened with a New York bank. Acting under the terms of the letter of credit Balanovski would assign a portion of it, equal to Cadic's purchase price, to the United States supplier. The supplier could then draw on the New York bank against the letter of credit by sight draft for 100% invoice value accompanied by (1) a commercial invoice billing Balanovski, (2) an inspection certificate, (3) a non-negotiable warehouse or dock receipt issued in the name of the New York bank for the account of IAPI's Argentine agent, and (4) an insurance policy covering all risks to the merchandise up to delivery FOB New York City. Then, if the purchase was one on which Cadic was to receive a quantity discount, the supplier would pay Balanovski the amount of the discount.

After the supplier had received payment Balanovski would draw on the New York bank for the unassigned portion of the letter of credit less 1% of the face

amount by submitting a sight draft accompanied by (1) a commercial invoice billing IAPI, (2) an undertaking to ship before a certain date, and (3) an insurance policy covering all risks to the merchandise up to delivery FAS United States seaport. The bank would then deliver the non-negotiable warehouse receipt that it had received from the supplier to Balanovski on trust receipt and his undertaking to deliver a full set of shipping documents including a clean on board bill of lading issued to the order of IAPI's Argentine agent with instructions to notify IAPI. It would also notify the warehouse that Balanovski was authorized to withdraw the merchandise. Upon delivery of these shipping documents to the New York bank Balanovski would receive the remaining 1% due under the terms of the letter of credit. Although Balanovski arranged for shipping the goods to Argentina, IAPI paid shipping expenses and made its own arrangement for marine insurance in Argentina. The New York bank would forward the bill of lading, Balanovski's invoice billing IAPI, and the other documents required by the letter of credit (not including the supplier's invoice billing Balanovski) to IAPI's agent in Argentina.

Twenty-four transactions substantially similar to the above pattern took place during 1947. Other transactions took place in that year. They too were substantially similar to the above pattern except that Cadic engaged the services of others to facilitate the acquisition of goods and their shipment to Argentina.

The law provides that the gross income of a nonresident alien individual "includes only the gross income from sources within the United States." Int. Rev.Code of 1939, § 212(a), 26 U.S.C.A. § 212(a). Therefore, if the profit that Cadic made on the sales to IAPI and the amount paid to Cadic by United States suppliers as discounts for quantity purchases were not from "sources within the United States", no tax is due from Messrs. Balanovski and Horenstein.

The Internal Revenue Code of 1939 provided that "Gains, profits and income derived from the purchase of personal property within and its sale without the United States * * * shall be treated as derived entirely from sources within *the country in which sold * * *.*" Int. Rev.Code of 1939, §§ 119(a)(6) and 119 (e), 26 U.S.C.A. § 119(a) (6), (e). (Emphasis added.) The defendants argue that the sales to IAPI took place in Argentina and the income derived from those sales was not derived from "sources within the United States." The Government takes the position that the sales to IAPI took place within the United States and that the income derived from those sales was derived from "sources within the United States."

In support of its position the Government cites several cases which hold or contain dicta to the effect that the country in which title passes to the buyer is the country in which a sale of personal property takes place and the "source" of the income derived from the sale. The leading case supporting this position is East Coast Oil Co., S.A., 1934, 31 B.T.A. 558, affirmed, 5 Cir., 85 F.2d 322, certiorari denied, Helvering v. East Coast Oil Co., 1936, 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449, in which the Board of Tax Appeals said, "* * * Of course, the place of contract, the place of delivery and of payment, the terms of the agreement, and the extraneous circumstances may each have a bearing. But the ultimate goal of the examination of all such considerations is to ascertain when and where the title to the goods passes from the seller to the buyer. It is then and there a sale is consummated—when and where property in the goods passes, when and where the incidents of ownership vest in the vendee. Such is the rule, long and firmly established." 31 B.T.A. at page 560. The reasoning implicit in this language has been followed in later cases. See Elston Co., Ltd., 1940, 42 B.T.A. 208; Ronrico Corp., 1941, 44 B.T.A. 1130; Exolon Co., 1941, 45 B.T.A. 844; G. A. Stafford & Co. v. Pedrick, D.C.S.D.N.Y., 78 F.Supp. 89, aff'd on another ground, 2 Cir., 1948, 171 F.2d 42. And in 1947 the Bureau of Internal Revenue followed the reasoning of the East

Coast Oil case and adopted "the general rule that for the purpose of determining the source of income attributable to the sale of personal property, a sale is consummated at the place where the seller surrenders all his right, title, and interest to the buyer. * * *" See G.C.M. 25131, 1947–2 Cum. Bull. 85.

With deference, I cannot accede to the reasoning of the Board of Tax Appeals in the East Coast Oil case. In my opinion, a rule that determines the source of income attributable to a sale of personal property by the place where title passed to the buyer does not sufficiently protect the interest of the United States in the collection of income taxes on income derived from sources within the United States. Nor does such a rule provide equitable treatment for taxpayers who are engaged in substantially similar transactions.

The unsatisfactory nature of "the place where title passes test" has been recognized by courts and by the Bureau of Internal Revenue. Thus, in affirming the Board's decision in the East Coast Oil case, the Court of Appeals for the Fifth Circuit did not rely solely on the fact that title passed to the buyer outside the United States. See 5 Cir., 1936, 85 F.2d 322; and Ardbern Co. v. Commissioner, 4 Cir., 1941, 120 F.2d 424. The Bureau of Internal Revenue has also refused to place exclusive reliance on "the place where title passes test." G.C.M. 8594, IX–2 Cum. Bull. 354, 358 (1930) states "the technical rules as to the passing of the property in the goods and the asssumption of risk are not determinative of the place of sale and the source of income from the sale of goods * * *." In yet another G.C.M. from which it appears that title to the goods for commercial law purposes passed to the buyer in Canada, the Bureau ruled that the source of income was the United States. See G.C.M. 13475, XIII–2 Cum. Bull. 223 (1934). And even in the G.C.M. that revokes G.C.M. 8594, supra, and adopts "the place where title passes test" as a "general rule" the Bureau states, " * * * (I)n any case in which the sales transaction is arranged in a particular manner for the primary purpose of tax avoidance, the foregoing rules ("place where title passes test") will not be applied. * * * In such cases, all factors of the transaction, such as negotiations, the execution of the agreement, the location of the property, and the place of payment, will be considered, and the sale will be treated as having been consummated at the place where the substance of the sale occurred." G.C.M. 25131, 1947–2 Cum. Bull. 85; and see Reg. 111, § 29.119–8 (1947).

Understandably, the Bureau was most concerned with the problem of tax avoidance when it provided for an exception to the "place where title passes test." While this Court, too, is concerned with the problem of tax avoidance, it is also concerned that taxpayers engaged in substantially similar transactions shall be subjected to similar tax burdens. Therefore, it cannot concur with a rule that (1) would exempt from income taxation the income attributable to a sale of personal property by a nonresident alien seller who was astute enough to arrange that title to the buyer should pass outside the United States and (2) would tax income from a similar transaction by an unwary or ill-advised nonresident alien who allowed title to pass to the buyer within the United States. The burden of income taxation should not depend on the "witty diversities" of the law which determines when and where title passed to the buyer, but in every case all factors of the transaction should be considered.

In the instant case negotiations leading to the sales by Cadic to IAPI were carried on in Argentina, the contract of sale was signed in Argentina, the buyer was an agency of the Argentine Government, and the ultimate destination of the goods was Argentina. Moreover, although the beneficial ownership of the goods and the risk of loss passed to IAPI in the United States, Cadic had no reason to insist that they should. Indeed, the architecture of the transactions makes it seem probable that IAPI, which was financing Cadic's purchases and paying Cadic in the United States, insisted that beneficial

ownership should pass to it in the United States in order to protect itself against the possibility of any fraudulent acts by Cadic and the possible intervening rights of third parties against Cadic. Thus, it appears likely that Cadic is not responsible for the fact that title to the goods passed to IAPI in the United States. Under these circumstances and for the purposes of section 119(e) of the Internal Revenue Code of 1939, the sale from Cadic to IAPI took place in Argentina, and the income derived by Cadic from the sales was not "from sources within the United States." It is therefore not subject to taxation by the United States.

I turn now to the question of whether the amount of the "discounts" for quantity purchases that Cadic received from United States suppliers constitutes income from "sources within the United States." The "discounts" were payments made to Cadic by United States suppliers after the suppliers had received payment equal to the face amount of their invoices billing Cadic. The payments were made in the United States and represented income to Cadic at the time they were paid to its agent, Balanovski. The fact that for the purposes of section 119(e), the sale of the goods purchased from the suppliers took place in Argentina has no bearing on whether the income from these payments was from "sources within the United States", for Cadic would have realized income on these payments no matter where the goods were sold. In my opinion, the payments to Cadic by United States suppliers whether called "discounts," "rebates," or "inducements" constitute "gross income from sources within the United States." Int.Rev.Code of 1939, § 212(a); see A.R.R. 265, 1920–3 Cum. Bull. 215; G. A. Stafford & Co. v. Pedrick, 2 Cir., 1948, 171 F.2d 42.

Having determined that Cadic realized "gross income from sources within the United States," it becomes necessary to determine whether either Cadic, or Balanovski or Horenstein as individuals, were engaged in trade or business in the United States. If Cadic was engaged in trade or business in the United States then both Balanovski and Horenstein as members of the partnership must be considered as having been so engaged and are taxable under the provisions of section 211(b). See Int.Rev.Code of 1939, §§ 211(b) and 219, 26 U.S.C.A. §§ 211 (b), 219. But if Cadic was not engaged in trade or business in the United States, Balanovski and Horenstein are taxable under the provisions of section 211(b) only if they were engaged in trade or business in the United States as individuals. If neither Balanovski nor Horenstein were so engaged then they are exempt from tax unless the payments to Cadic from the United States suppliers are held to be " * * * fixed or determinable annual or periodical gains, profits, and income * * *." Int.Rev.Code of 1939, §§ 211(a) and 211(c).

Cadic was not engaged in trade or business in the United States. It is true that Balanovski represented Cadic while he was in the United States, but the fact that a foreign partnership has a representative in the United States is not sufficient ground for holding that it is engaged in trade or business in the United States. See Linen Thread Co., 14 T.C. 725, 734 (1950); Jorge Pasquel, 12 T.C.M. 1431 (1953). The representative's activities must be such as to justify a finding that the foreign partnership was so engaged. See Jan C. Lewenhaupt, 20 T.C. 151 (1953). Balanovski's activities in the United States were those of a purchasing agent. He located suppliers, inspected the goods that they had to sell, and took care of the details of paying the suppliers and of shipping the goods to Argentina. In addition to the activities described in the preceding sentence, both IAPI and the United States suppliers from whom Cadic received discounts for quantity purchases paid Balanovski in the United States. In my opinion, a decision that activities of this nature are sufficient to bring Cadic within the class of partnerships engaged in trade or business in the United States would only deter foreign business organizations from purchasing goods in the United States and from engaging the

services of banking institutions located in the United States. It seems clear that Congress did not intend such a result. See Int.Rev.Code of 1939, § 211(b); H.R. Rep. No. 2475, 74th Cong., 2d Sess. 9 (1936). Since Cadic negotiated the sales to IAPI in Argentina where the contracts were signed and where both parties resided, Cadic's profits resulted from its activities in Argentina and it was not engaged in trade or business in the United States. See T.D. 3111, 1921–4 Cum. Bull. 280; Amalgamated Dental Co., Ltd., 6 T.C. 1009 (1946).

■ Thus Balanovski or Horenstein can only be considered engaged in trade or business in the United States if they were so engaged as individuals. It is clear from the stipulated facts that Horenstein was not so engaged, but at the same time it seems equally clear that Balanovski was. Section 211(b) of the Internal Revenue Code of 1939 provides that "the phrase 'engaged in trade or business within the United States' includes the performance of personal services within the United States at any time within the taxable year * * *." There is an exception, but it does not apply to Balanovski because he was present in the United States for a period exceeding ninety days during the taxable year. See Int.Rev.Code of 1939, § 211(b). The provision does not say that it applies only to the "performance of personal services" by an *employee*, and I can see no reason why it should be read in such a limited way. Balanovski was performing personal services for Cadic in the United States. He may or may not have been compensated for the performance of these services by the payment of compensation from Cadic, but he was undoubtedly benefitting from the performance of the services because of his status as a partner. Nor were his activities in the United States similar to the isolated transactions described in European Naval Stores Co., S.A., 11 T.C. 127 (1948) and Jorge Pasquel, 12 T.C.M. 1431 (1953). Under these circumstances Mr. Balanovski was engaged in trade or business in the United States and is taxable on any income from sources within the

United States under the provisions of section 211(b) of the Internal Revenue Code of 1939.

■ Although Mr. Horenstein was not engaged in trade or business in the United States and is therefore not taxable under section 211(b), he is taxable under section 211(c) because the payments made to Cadic by United States suppliers constitute "fixed or determinable annual or periodical gains, profits, and income * * *." See Int.Rev.Code of 1939, § 211; A.R.R. 265, 1920–3 Cum. Bull. 215. The legislative history of section 211 indicates that what is "fixed or determinable annual or periodical income" for the purposes of the withholding provisions is "fixed or determinable annual or periodical income" for the purposes of section 211. See H.R.Rep.No. 2475, 74th Cong., 2d Sess. 9–10 (1936). The regulations dealing with the withholding provisions state, "Income is fixed when it is to be paid in amounts definitely predetermined. Income is determinable whenever there is a basis of calculation by which the amount to be paid may be ascertained. * * *" Reg. 111, § 29.-143–2 (1947). Under this language the payments that Cadic received from United States suppliers were "fixed or determinable" because their amount could be ascertained from the amount of the purchase price and the percent of the discount allowed on the purchase. The fact that payments are not made annually or periodically does not prevent them from being "fixed or determinable annual or periodical gains, profits, and income * * *." See Commissioner of Internal Revenue v. Wodehouse, 1949, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419.

The parties have concentrated on the issue of tax liability. They have given relatively little attention to a discussion of the extent of this Court's jurisdiction over Cadic and Messrs. Balanovski and Horenstein. The United States contends that service of the summons and complaint on Balanovski's attorney in fact, Miss Devine, was sufficient to give this Court in personam juris-

diction over Balanovski. Defendants argue that service on Miss Devine was not effective to achieve that result or to give this Court in personam jurisdiction over the partnership. I believe that supplemental briefs containing a fuller discussion of the facts and the law on the issue of jurisdiction would be helpful, and I direct the parties to file such briefs by March 23, 1955 at 5:00 P. M.

Since I find that the Government has proved its case with respect to the taxability of the discounts, it is not necessary for me to discuss the validity of the assessments made by the Government.

### Supplemental opinion

In their supplemental brief on the jurisdictional issues, defendants contend that the discount payments made by United States suppliers to Cadic must be treated as a reduction in Cadic's cost that cannot be separated from the profit made on the sales to IAPI. Defendants contend that since the profit on the sales was from a source without the United States, that portion of it that is represented by the payments from United States suppliers must also be considered as derived from a source without the United States. I do not want to repeat what has already been said on the issue of the taxability of these payments, but I wish to emphasize certain considerations. First, it is by no means clear that the payments involved in this case would be considered as reducing Cadic's cost of goods sold even for purposes of inventory valuation. See Regulation 118, § 39.22(c)–3. The Regulations provide:

"Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller * * * should exclude from inventory goods sold * * * title to which has passed to the purchaser * * *." Regulations 118, § 39.22(c)–1.

Defendants admit that in this case the seller, Cadic, never had title to the goods purchased from the United States suppliers.[1] Second, the fact that for accounting purposes the payments involved in this case would be considered as a reduction in cost and as part of the profit made by Cadic on the sales to IAPI, does not require that they be so considered here. These payments arose out of agreements made in the United States between United States suppliers and Cadic to give Cadic certain sums of money. The agreements were made without reference to the sales by Cadic to IAPI. The sums were transferred to Cadic by the suppliers in the United States, and Cadic did not have to wait for IAPI to pay for the goods before it realized the income from these payments. I therefore believe that these payments must be treated as arising separately from the income realized as a result of the sales to IAPI, and that they are income from a source within the United States.

But assuming *arguendo* that defendants' contention is correct, there is another basis upon which the total amount realized by Cadic as a result of its transactions with IAPI, including the payments from suppliers, are subject to income taxation. This case was tried on the assumption that the relationship between Cadic and IAPI was one of seller and buyer, and that the income realized by Cadic as a result of its dealings with IAPI was in the nature of profit from sales. However, the evidence indicates that Cadic may have been only a purchasing agent for IAPI and that the income that it received as a result of the transactions involved in this case was more in the nature of compensation for services than profit from sales.

The fact that Cadic may have engaged in other transactions in the role of a seller is some evidence that the rele-

1. "Defendants' Memorandum for Court" states at page 31, " * * * In the case of CADIC and I.A.P.I., title *never* passed from the seller to the buyer. The seller never had title. CADIC's American sup- plier delivered the documents to the New York bank, which in turn delivered them to the bank of I.A.P.I. in Argentina (emphasis in original) * * *."

vant transactions with IAPI were sales. But it is not conclusive. Nor is the fact that the contracts between Cadic and IAPI were called contracts of purchase and sale conclusive evidence that the transactions with which we are here concerned were sales by Cadic to IAPI rather than purchases from United States suppliers in which Cadic acted as IAPI's agent.

It is undisputed that before purchasing goods from a United States supplier it was the practice of Cadic to determine whether IAPI would commit itself to take the goods.[2] And the evidence shows that Cadic did not invest its own funds when it purchased goods from United States suppliers. In every case with which we are here concerned IAPI opened a letter of credit in favor of Balanovski with a New York bank, and it was by assigning a portion of this letter of credit to the supplier that Balanovski financed the purchase from the supplier.

Finally, it is clear (and indeed defendants admit), that Cadic never had title to the goods purchased from the suppliers.[3] The United States supplier would deliver to a New York bank a non-negotiable warehouse or dock receipt issued in the name of the bank for the account of IAPI's Argentine agent and an insurance policy covering all risks to the merchandise up to delivery FOB New York City. Balanovski would secure possession of the goods on trust receipt for the purpose of arranging for their shipment to Argentina by submitting to the bank an undertaking to ship the goods and an insurance policy covering all risks to the goods up to delivery FAS United States seaport. Before Balanovski took possession the bank would notify the warehouse in which the goods were stored that Balanovski was authorized to withdraw them. The bill of lading would be made out to the order of IAPI's Argentine agent with instructions to notify IAPI, and IAPI would pay shipping expenses and make its own arrangement for marine insurance.

Thus Cadic, the alleged seller, assumed none of the risks that are usually associated with sales of goods. Before it committed itself to purchase goods from suppliers, IAPI was committed to take the same goods, and any possibility that IAPI might renege was obviated by the fact that IAPI's money was used to effectuate the purchase. And since IAPI had title to the goods from the time that title passed from the United States supplier, IAPI bore the risk of loss of or damage to the goods. Indeed, the fact that Cadic never had title to the goods is in itself an indica-

2. When his deposition was taken on April 30, 1953, Mr. Balanovski testified as follows in response to questions put to him by his counsel:
"Q. * * * Tell us the course that the transactions took. A. If I understand correctly you want to know how the thing was handled.
"Q. Yes. First you buy the stuff. A. No, sir. First we sell.
"Q. First you sell in South America? A. We never bought something if we did not have it sold. The first thing, we would get a quotation for such and such merchandise at such and such a price; so I would cable my partner in Buenos Aires and tell him I had an option on such and such a quantity of material at such and such a price and send by airmail if necessary the corresponding photostatic copies of what it looked like or to which reference it corresponded on the books, for people to know what material was being offered.
"Immediately my partner would send in an offer to the Instituto (IAPI) for them to consider it. Of course there was always a difference between the cost and the selling price * * *. (p. 54)
* * * * * * *
"Q. But when do you notify the supplier that you are taking his merchandise? A. Immediately upon the first advice I have in from my people. In other words, if they tell me by telephone this morning that such and such merchandise has been approved, then I would immediately let know our supplier that I take the merchandise they have submitted.
"Q. That you exercised the option to take and buy the merchandise from the supplier? A. Yes. (p. 57)

3. See note 1, supra.

tion that there was no sale from it to IAPI and that it merely purchased as IAPI's agent. See Uniform Sales Act, § 1; Simon v. Commissioner, 2 Cir., 1949, 176 F.2d 230, 232–233.

Of course, if Cadic were to be considered a purchasing agent for IAPI, rather than a seller to IAPI, the conclusions heretofore reached on the issues of whether Cadic was engaged in trade or business in the United States and whether the income realized by Cadic as a result of its transactions with IAPI was from a source within the United States would have to be modified so as to enlarge the defendants' tax obligations. Since, if Cadic was a purchasing agent with respect to these transactions, it would follow that it was performing personal services for IAPI within the United States; and that Cadic, and therefore both Balanovski and Horenstein, the sole partners, were engaged in trade or business in the United States under section 211(b) of the Internal Revenue Code of 1939. See Internal Revenue Code of 1939, § 219. Furthermore, if Cadic was a purchasing agent for IAPI, its income from these transactions was in the nature of compensation for personal services and should be treated as income from a source within the United States. See Internal Revenue Code of 1939, § 119(a) (3); Regulation 111, § 29.119(4); Helvering v. Boekman, 2 Cir., 1939, 107 F.2d 388.

As I have said, this case was tried on the assumption that the relationship between Cadic and IAPI was one of seller and purchaser. Since this may have influenced the choice of the evidence presented at the trial by the United States and the defendants, I prefer to rest my decision on the ground already stated rather than on the ground that Cadic was a purchasing agent for IAPI. Thus, only the amount of the payments made to Cadic by United States suppliers are subject to taxation as income from a source within the United States.

I turn now to the jurisdictional issues. In this action the United States seeks to enforce a lien allegedly arising under section 3670 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3670. Section 3670 provides:

> "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

The United States argues that Messrs. Balanovski and Horenstein, who are liable for tax upon the income realized by Cadic under Section 181 of the 1939 Code, are owners of "property and rights to property" in certain funds belonging to Cadic that are on deposit in two New York banks. The defendants deny this and contend that partnership assets cannot be used to satisfy the income tax liabilities of the individual partners even though the liabilities arose from partnership activities.

The defendants rely on cases holding that partners' liabilities for their individual income tax cannot be satisfied out of partnership assets when those assets are insufficient to satisfy partnership debts. See United States v. Kaufman, 1925, 267 U.S. 408, 45 S.Ct. 322, 69 L.Ed. 685; United States v. Hack, 1834, 8 Pet. 271, 8 L.Ed. 941; Adler v. Nicholas, 10 Cir., 1948, 166 F.2d 674; but cf. In re Strassburger, C.C. M.D.Ala.1877, 23 Fed.Cas. page 224, No. 13,526. But these cases are distinguishable from the instant case because the instant case does not involve any conflict between the United States and partnership creditors. The only issue in this case is whether Messrs. Balanovski and Horenstein have "property and rights to property" in the partnership bank account.

Since an Argentine partnership is involved, Argentine law determines the interests of the partners in specific partnership property. Blodgett v. Silberman, 277 U.S. 1, 48 S.Ct. 410, 72 L.Ed. 749 (1928); see Casola v. Kugelman, 1st Dept. 1898, 33 App.Div. 428, 54 N.Y.S. 89, affirmed on opinion below,

Casola v. Vasquez, 1900, 164 N.Y. 608, 58 N.E. 1085; King v. Sarria, 1877, 69 N.Y. 24. Of course, it does not determine whether those interests are "property and rights to property" within the meaning of section 3670 of the Internal Revenue Code of 1939. The terms of a United States statute are involved, and this question must be determined by United States law. See Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 288, 66 S.Ct. 532, 536, 90 L. Ed. 670; United States v. Acri, 1955, 348 U.S. 211, 75 S.Ct. 239; United States v. Liverpool & London & Globe Ins. Co., 1955, 348 U.S. 215, 75 S.Ct. 247.

Here the parties have stipulated that the Argentine law governing the interests of the partners in specific partnership property is not materially different from the law of the State of New York. Therefore, in order to decide whether Messrs. Balanovski and Horenstein have "property and rights to property" in Cadic's bank accounts the following questions must be answered:

(1) What are partners' rights in specific partnership property under New York law, and

(2) Are these rights of such a nature that it is justifiable to conclude that a partner has "property and rights to property" in specific partnership assets within section 3670 of the Internal Revenue Code of 1939?

■ Under New York law a partner's property rights include "his rights in specific partnership property * *." N.Y. Partnership Law, McKinney's Consol.Laws, c. 39, § 50(a). "A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership", and a partner has the right to possess specific partnership property for other than partnership purposes with the consent of his partners and to assign his right in such property in connection with the assignment of the rights of all the partners in the same property. See N.Y. Partnership Law, § 51, subds. 1, 2(a), and 2(b). Furthermore, "On due application to a competent court by any judgment creditor of a partner, the court * * * may charge the interest of the debtor partner with payment of the unsatisfied amount of such judgment debt with interest thereon * * * and make all other orders * * * which the circumstances of the case may require." N.Y. Partnership Law, § 54, subd. 1.

■ Thus, under New York law Balanovski could use Cadic's funds to pay his taxes if he secured Horenstein's consent, and Horenstein could use Cadic's funds to pay his taxes if he secured Balanovski's consent; or the two could join together to assign their rights in the funds belonging to the partnership. See Commissioner v. Whitney, 2 Cir., 169 F.2d 562, 567, certiorari denied, 1948, 335 U.S. 892, 69 S.Ct. 246, 93 L. Ed. 429. Moreover, if the United States were a judgment creditor of Messrs. Balanovski and Horenstein, a court could find that "the circumstances of the case * * * require" that it order that Cadic's funds be paid to the United States to satisfy the tax liabilities of the sole partners. Finally, it is possible that execution could be levied on Cadic's funds because the liability arises out of partnership activities and none of the partners is free from tax liability. See Geitner v. United States Fidelity & Guaranty Co., 1929, 251 N.Y. 205, 167 N.E. 222; Davis v. Delaware & Hudson Canal Co., 1888, 109 N.Y. 47, 15 N.E. 873.

These are the interests that a partner has in specific partnership property under New York law. Are these interests of such a nature that a partner may be said to have "property and rights to property" within the meaning of section 3670 of the Internal Revenue Code of 1939 in specific partnership assets? In United States v. Worley, 6 Cir., 1954, 213 F.2d 509, certiorari denied, 1955, 348 U.S. 917, 918, 75 S.Ct. 301, 302, the Court of Appeals for the Sixth Circuit held that they are not. The Court in the Worley case relied on United States

v. Kaufman, 1925, 267 U.S. 408, 45 S. Ct. 322, 69 L.Ed. 685 and Adler v. Nicholas, 10 Cir., 1948, 166 F.2d 674. But as I have pointed out, these cases and the Worley case are distinguishable from the instant case because the instant case does not involve any conflict of interest between the United States and partnership creditors. In this case the United States seeks to enforce its lien at a time when the only conflicting interest is that of the defendant partners who are themselves liable for the taxes involved. No other partners and no creditors would be adversely affected if the lien were enforced. And cf. In re Strassburger, C.C.M.D.Ala.1877, 23 Fed. Cas. page 224, No. 13,526. Moreover, since the partners are residents and citizens of a foreign country who are no longer in the United States and the partnership is a foreign partnership, the United States would not be able to recover the taxes due from the partners if it were unable to establish and enforce its lien. See Internal Revenue Code of 1939, § 146(e), 26 U.S.C.A. § 146 (e); N.Y. Partnership Law, § 54.

In the light of these facts I conclude that Messrs. Balanovski and Horenstein have "property and rights to property" in the partnership bank account which is subject to lien for their unpaid individual income taxes.

 Messrs. Balanovski and Horenstein were served with process pursuant to 28 U.S.C. § 1655. They then appeared before this Court by their attorneys and proceeded to defend this action. The Government claims that by doing so they subjected themselves to the jurisdiction of this Court, and that the Court can now render a judgment which will be binding on them personally. The position of the Government is sound. Campbell v. Murdock, D.C.N.D.Ohio 1950, 90 F.Supp. 297; Grant v. Kellegg Co., D.C. S.D.N.Y.1943, 3 F.R.D. 229; Bede Steam Shipping Co. v. New York Trust Co., D.C.S.D.N.Y.1931, 54 F.2d 658; 2 Moore's Fed.Prac., par. 12.13 (2d ed. 1948). There is no reason why a defendant who has had his day in court should be entitled to relitigate the merits of a case.

This ruling does not conflict with the language or policy of Rule 12(b) of the Federal Rules of Civil Procedure, 28 U. S.C.A., that "(n)o defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion." A defendant may object, as this defendant has, that the court has no jurisdiction over the assets and join that objection with a defense on the merits. The jurisdictional objection is not lost. If a trial or appellate court upholds the claim of lack of jurisdiction over the assets, then the determination of the merits is without effect and plaintiff must institute a new action. But if the trial court determines that it has jurisdiction over the assets and that determination is upheld on appeal, a judgment that will bind the defendant personally can be rendered. See 2 Moore's Fed.Prac., par. 12.12 (2d ed. 1948).

My decision on this issue makes it unnecessary for me to decide whether service on Miss Devine, Balanovski's agent, gave this Court in personam jurisdiction over Mr. Balanovski. But if a decision were necessary, I should have no difficulty in concluding that service on Miss Devine constituted valid service on Balanovski. Before leaving the United States Mr. Balanovski gave Miss Devine a power of attorney that empowered her to act in his behalf in making contracts and in handling financial transactions with certain banks and with individuals. The power of attorney also contained a provision in which Mr. Balanovski gave "unto said attorney(s) full power and authority to do and to perform every act whatsoever requisite and convenient to be done in the premises as fully as I might do if personally present with full power of substitution and revocation, hereby ratifying all that my said attorney(s) or the substitute(s) shall do or cause to be done by virtue hereof * * *." This power of attorney was not revoked before Miss Devine was served with process, and I be-

lieve that service on her was sufficient to give this Court in personam jurisdiction over Mr. Balanovski. See Fed.R.Civ.P. 4(d) (1); Latimer v. S/A Industries Reunidas F. Matarazzo, 2 Cir., 175 F. 2d 184, certiorari denied, 1949, 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531; Scholnik v. National Airlines, Inc., 6 Cir., 219 F.2d 115.

The action against Miss Devine is dismissed on consent.

Judgment for the plaintiff. Settle order on notice.